The CITY OF GALVESTON, TEXAS acting By and Through the BOARD OF TRUSTEES OF the GALVESTON WHARVES, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 522–89T.

United States Claims Court.

Feb. 26, 1991.

Brian J. McKenna, Chicago, Ill., attorney of record, for plaintiff. Benjamin R. Powel and McLeod, Alexander, Powel & Apffel, of counsel.

George L. Squires, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

HARKINS, Senior Judge.

The City of Galveston, Texas, seeks a refund of employment taxes paid for calendar years 1985–87 under the Railroad Retirement Tax Act (RRTA)[1] and the Railroad Unemployment Repayment Tax (RURT).[2] During the period the employment taxes were paid, the Board of Trustees of the Galveston Wharves (Galveston

---

[1]. 26 U.S.C. §§ 3201 et seq. (1988).

[2]. 26 U.S.C. §§ 3321 et seq. (1988).

Wharves) was the unit of the City responsible for managing its Port of Galveston properties. Galveston Wharves was a rail carrier covered by the Railroad Retirement Act (RRA)[3] and the Railroad Unemployment Insurance Act (RUIA)[4]. The RRTA and RURT are administered by the Internal Revenue Service (IRS) and the RRA and the RUIA are administered by the Railroad Retirement Board (RRB). Plaintiff's claim is before the court on defendant's motions to dismiss for lack of subject matter jurisdiction, or alternatively, for failure to state a claim upon which relief may be granted, and on cross-motions for summary judgment.

The City of Galveston is an island situated two miles off the Texas coast on the Gulf of Mexico. The Port of Galveston is located at the entrance of Galveston Bay and provides access to the open Gulf. The Port of Galveston has 23,700 linear feet of developed water frontage. Galveston Wharves manages extensive facilities in the Port of Galveston, including public wharves, docks, transit sheds, storage facilities, warehouses and freight handling facilities.

Effective November 30, 1940, the City of Galveston, pursuant to an authorization of the Interstate Commerce Commission (ICC), succeeded to the interest of the Galveston Wharf Company (GWC), a private corporation. GWC was a terminal and switching railroad within the City that owned and operated main and switching tracks, improved waterfront properties, steam switching locomotives, wharves, warehouses and an elevator. GWC was a "carrier-employer" within the meaning of the RRA and the RUIA; its operations were performed under tariffs filed with the ICC, and all of its employees were reported as being employees under the railroad Acts.

At the time of the conveyance, the City organized the Board of Trustees of Galveston Wharves to manage and direct the operations of the properties. Galveston Wharves adopted and operated under the tariffs of GWC, and conducted the same business activities that formerly had been conducted by GWC.

The relationship of the work force of the City to the operations of Galveston Wharves was clarified in a determination letter of the RRB dated June 2, 1941.[5] The RRB determined that Galveston Wharves by virtue of its operations was an employer as a carrier by railroad subject to Part I of the Interstate Commerce Act. The City of Galveston, as the legal entity charged by the ICC with the duty of operating the railroad properties, was responsible for the performance of the Galveston Wharves' duties as an employer under the RRA and the RUIA. The City and its employees, however, were segregated from the rail carrier operations. The determination letter states:

> The business of the Board of Trustees, however, appears to constitute a relatively minor part of all the activities of the City of Galveston. This carrier business is conducted by an identifiable unit, the Board of Trustees of Galveston Wharves and its operating personnel, which is physically separable from the other activities of the city, and its accounts are maintained separately from the general accounts of the city. The City of Galveston in its activities other than those conducted by the Board of Trustees, therefore, is not an employer under the Acts. Regulations, Section 202.03, 4 Federal Register 1478 (April 7, 1939); Regulations, Section 301.04, 5 Federal Register 2717 (August 1, 1940). Only the unit managed and directed by the Board of Trustees of Galveston Wharves has been such an employer, and only those compensated services rendered by city workmen employed in the Board of Trustees' operations, upon proper verification and to the extent that they are relevant to applications and claims, are creditable under the Acts.

---

**3.** 45 U.S.C. §§ 231 et seq. (1988).

**4.** 45 U.S.C. §§ 351 et seq. (1988).

**5.** General Counsel Legal Opinion L–41–263.

Galveston Wharves operated the Port Authority properties, including the railroad properties, from December 1940 until November 4, 1987. On October 10, 1987, Galveston Wharves voted to discontinue the operation of its terminal railroad by selling its railroad assets to Galveston Railroad, Inc. (GRI), an unrelated private corporation. The realty and improvements used in the railroad operations were leased to GRI. On October 29, 1987, the ICC approved the sale and lease to GRI of the railroad line and right of way in and around the Port of Galveston which had formerly been operated by Galveston Wharves. The sale and lease became effective on November 5, 1987.

In its consideration of employer status, the RRB, on January 15, 1988, initially determined that GRI became an employer on November 5, 1987, and that Galveston Wharves continued to be an employer, having become a lessor employer on that date.[6] On reconsideration, the decision concerning the lessor employer status of Galveston Wharves was affirmed on September 29, 1988.[7]

Pending appeal from the decision in legal opinion L–88–107, Galveston Wharves did not seek to amend its prior reports to the RRB that were based on its status as an employer, under the RRA and the RUIA, with respect to all of its employees. No request was made to the RRB for a segregation of employees engaged in rail carrier operations from employees engaged in non-rail operations. No contention was made that some of Galveston Wharves' operations were unrelated to rail carrier business and that the RRTA and RURT did not apply to Galveston Wharves and its employees associated with such unrelated operations.

For the period 1941 through November 4, 1987, Galveston Wharves filed annual reports with the RRB that reported all of its employees as employees of an employer under the RRA and RUIA, and which reported that all of the compensation it paid to its employees was qualified compensation under the RRA and under the RUIA. For taxable periods 1941 through November 4, 1987, Galveston Wharves originally paid or withheld RRTA and RURT taxes with respect to every employee in every department.

During the period 1985 through 1987, Galveston Wharves each year employed between 233 and 429 individuals. Between 164 and 343 individuals were classified by Galveston Wharves as individuals engaged in nonrail port operations, and between 69 and 85 were classified as individuals in rail operations.

Galveston Wharves timely filed its Employer's Annual Railroad Retirement Tax Return, Form CT–1, with the Internal Revenue Service Center and timely paid RRTA and RURT taxes to the Internal Revenue Service as follows:

| Year | RRTA/RURT Taxes Reported and Paid With Form CT–1 |
| --- | --- |
| 1985 | $ 1,785,456.69 |
| 1986 | $ 1,742,511.69 |
| 1987 | $ 1,299,626.88 |
| Total RRTA/RURT taxes paid for 1985 to 1987 | $ 4,827,595.26 |

The appeal of legal opinion L–88–107 was concluded on February 22, 1989. The RRB ruled that Galveston Wharves ceased to be an employer, effective November 5, 1987, within the meaning of the RRA and the RUIA.

6. General counsel Legal Opinion L–88–5.

7. General counsel Legal Opinion L–88–107.

After the RRB February 22, 1989, decision, Galveston Wharves filed with the IRS on Form 843 dated February 22, 1989, claims for refunds for 1985, 1986 and 1987 that claimed the total amount that had been reported and paid in each year, totaling $4,827,595.26. Each claim in Box 11 explained that Galveston Wharves "seeks only a recovery of the portion of these taxes paid with respect to individuals engaged in nonrail operations."

The complaint was filed September 22, 1989. At that time more than six months had elapsed since the filing of the claims for refund for years 1985, 1986 and 1987, and the claims had been neither allowed or disallowed by the IRS. Defendant filed its answer on January 29, 1990, and on February 20, 1990, filed its motion to dismiss for lack of jurisdiction of the subject matter, RUSCC 12(b)(1).

On February 16, 1990, Galveston Wharves filed amended claims for refund on Form 843 for years 1985–87. Galveston Wharves stated the amended claims were being filed because the United States in its answer in this case had denied subject matter jurisdiction due to a failure to comply with I.R.C. § 7422(a), and defendant's counsel had stated the claims may be defective for lack of specificity under Treas.Reg. § 301.6402–2(b)(1). The explanation for the amended claim, Box 11, included the following statements:

(8). During the period January 1, 1985 to November 4, 1987, Galveston Wharves provided services as a "carrier by railroad, subject to subchapter 1 of chapter 105 of title 49" as this term is used in I.R.C. Sections 3231(g) and 3231(a). As such, Galveston Wharves acknowledges and concedes a total RRTA/RURT liability of $2,135,565.38 for this period.

(10). If Galveston Wharves is not an "employer" subject to the RRTA/RURT with respect to its nonrail port authority operations, Galveston Wharves and the employees participating in these claims would have overpaid RRTA/RURT taxes and would be entitled to refunds as follows:

| Year | Employer Overpayment | Employee Overpayment | Total Overpayment |
|------|---------------------|---------------------|-------------------|
| 1985 | $889,799.70 | $132,935.08 | $1,022,734.78 |
| 1986 | $877,451.20 | $128,972.06 | $1,006,423.26 |
| 1987 | $581,194.70 | $ 81,677.14 | $ 662,871.84 |
| Total | $2,348,445.60 | $343,584.28 | $2,692,029.88 |

By letters dated March 27, 1990, the IRS notified Galveston Wharves of the disallowance of the original February 22, 1989, claims and the amended February 16, 1990, claims. With respect to the February 22, 1989, claims, each IRS notice contained the following reason for disallowance:

The IRS procedures provide that claims not acted upon before refund suits are filed in court are automatically disallowed. Furthermore, if any action had been taken with respect to the original refund claims they would have been disallowed because they do not comply with the requirements of Treas.Reg. 301.-6402–2(b)(1).

With respect to the February 16, 1990, amended claims, the reasons for disallowance were stated as follows:

Tax Period 1985: —"Statute of limitations has expired."

Tax Period 1986: —"Original claim filed is pending litigation."

Tax Period 1987: —"Original claim filed is pending litigation."

## DISPOSITION

Oral argument on defendant's motions to dismiss and the cross-motions for summary judgment was heard on October 31, 1990. At the end of argument, defendant's motion to dismiss under RUSCC 12(b)(1) for

lack of subject matter jurisdiction was denied. Decision was deferred on defendant's motion to dismiss under RUSCC 12(b)(4) for failure to state a claim on which relief can be granted, and on the cross-motions for summary judgment.

Defendant's motions to dismiss reflect a persistent confusion over the meaning of "jurisdiction" as that term applies in claims against the United States under the Tucker Act.[8] As explained below, defendant's motions to dismiss must be denied. Final determination of plaintiff's tax refund claim is founded on the procedures and legal principles applicable to cross-motions for summary judgment. The cross-motions for summary judgment require decision as to whether the statutory scheme permits the City acting through Galveston Wharves to amend in 1989 tax returns for 1985–87 to show a status as an employer that is contrary to the status asserted before the RRB and approved by the RRB for those years.

■■■ RUSCC 12(b) permits the United States to assert jurisdictional defenses that, where appropriate, result in expeditious disposition of claims against the Government. Dismissal of a claim for a tax refund on the basis of the pleadings precludes consideration of supporting evidence on substantive merits. The procedure is drastic and should be used only when clearly appropriate. Where the complaint identifies sections of the IRC and Treasury regulations on which the claim is based, if the court is persuaded that federal law does not give the right claimed, the court should dismiss for failure to state a claim upon which relief can be granted rather than for want of subject matter jurisdiction.[9]

Factual inquiry on a motion to dismiss under RUSCC 12(b) is limited. In passing on a motion to dismiss, whether on the ground of lack of subject matter jurisdiction or for failure to state a cause of action, the allegations in the complaint are to be considered favorably to the pleader. The issue is not whether the plaintiff ultimately will prevail; it is whether the plaintiff is entitled to offer evidence to support facts alleged in the complaint.[10]

In claims arising under the Tucker Act, issues relative to sovereign capacity and consent to be sued cloud the jurisdictional concept. Subject matter jurisdiction relates to the area of substantive law that Congress has empowered the court to adjudicate. The exercise of subject matter jurisdiction, in claims against the Government, is further restricted in particular cases by specific facts that implicate the consent of the sovereign to be sued.

As a consequence, the term "jurisdiction" has been given at least two distinct meanings. First, the court's general powers to adjudicate in specific areas of substantive law—subject matter jurisdiction. Second, the jurisdiction in a particular case for the court to exercise its general power on the facts peculiar to a specific claim.[11] A party may fail to state a claim on which relief can be granted when the facts relevant to the particular claim show it to be barred by limitations under 28 U.S.C. § 2501 or I.R.C. § 6511, or by a variance issue under I.R.C. § 7422(a).

■■ When a question as to the court's subject matter jurisdiction is raised, relevant evidence through affidavits or otherwise may be considered. Consideration of such evidence in addition to the pleadings does not convert a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment.[12] When

**8.** Act of Mar. 3, 1887, C.359, 24 Stat. 505; now codified at 28 U.S.C. § 1491(a) (1988).

**9.** *See Mindes v. Seaman,* 453 F.2d 197, 198 (5th Cir.1971) *citing* C. Wright, Law of Federal Courts 62 (2d ed. 1970).

**10.** *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Aleut Commu-*

*nity of St. Paul Island v. United States,* 480 F.2d 831, 838, 202 Ct.Cl. 182 (1973).

**11.** *See Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir.1986).

**12.** *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exchange Services,* 846 F.2d 746, 748 (Fed.Cir.1988).

additional information is necessary to resolve a motion to dismiss for failure to state a proper cause of action, however, the result is otherwise. Further, where the facts in the pleadings establish the court lacks jurisdiction to exercise its general power in the particular case, the second meaning of jurisdiction, dismissal for failure to state a claim upon which relief can be granted, is on the merits as to those facts. The distinction between lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted is important. The failure to state a proper cause of action calls for a judgment on the merits. A dismissal on the merits carries res judicata effect.[13]

In this case, defendant's motions to dismiss were not confined to the facts alleged in the pleadings, or even to the facts related to the variance issue. Defendant's attachments to its motions to dismiss included facts relevant to plaintiff's acquisition of GWC's interest in the railroad, related administrative records made by the ICC and the RRB in 1940 and 1941, and a multitude of materials relevant to the segregation issue. Under RUSCC 12(b)(4), by operation of the terms of the rule, defendant's motion to dismiss was converted to a motion for summary judgment. For tactical reasons, defendant subsequently filed a cross-motion for summary judgment in response to plaintiff's motion.

■ The Court of Claims, and now this court, has had subject matter jurisdiction over suits for refund of federal taxes since enactment of the Tucker Act in 1887. This source of tax refund jurisdiction has been recognized by the Supreme Court, and has been explicitly declared by the Court of Claims.[14] The Tucker Act conferred subject matter jurisdiction over claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." In a tax refund case, money is in the possession of the Government, and the claim must assert that the value sued for was improperly paid or exacted in contravention of a statute or a regulation.[15]

Defendant's motion to dismiss for failure to state a claim upon which relief can be granted is based upon the statute and regulations applicable to claims for a refund, the so-called variance issue. The variance issue has been addressed in many cases. The Federal Circuit, in *Ottawa Silica*,[16] articulated its elements as follows:

> The Internal Revenue Code prohibits any taxpayer from maintaining an action to recover taxes from the Government unless a claim for a refund has first been filed with the Internal Revenue Service (IRS). 26 U.S.C. § 7422(a) (1976).[*] The regulations further provide that the claim for a refund "must set forth in detail each ground upon which a credit or a refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas.Reg. § 301.6402–2(b)(1) (1955). Together, the statute and the regulation preclude a taxpayer-plaintiff from substantially varying at trial the factual bases of its arguments from those raised in the refund claims it presented to the IRS. *Union Carbide Corp. v. United States*, 222 Ct.Cl. 75, 90, 612 F.2d 558, 566 (1979); *Cook v. United States*, 220 Ct.Cl. 76, 86–87, 599 F.2d 400, 406 (1979).[17]

[*] The statute provides:

"No suit or proceeding shall be maintained in any court for the recovery of any internal reve-

13. *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 639–40 (Fed.Cir.1989).

14. *Flora v. United States*, 357 U.S. 63, 70–71, 78 S.Ct. 1079, 1083–84, 2 L.Ed.2d 1165 (1958), *on rehearing*, 362 U.S. 145, 151, 80 S.Ct. 630, 633–34, 4 L.Ed.2d 623 (1960); *Bates Mfg. Co. v. United States*, 303 U.S. 567, 568, 58 S.Ct. 694, 695, 82 L.Ed. 1020 (1938); *Tecon Engineers, Inc.*

v. *United States*, 343 F.2d 943, 170 Ct.Cl. 389, 393 (1965).

15. *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967).

16. *Ottawa Silica Co. v. United States*, 699 F.2d 1124 (Fed.Cir.1983).

17. *Id.* at 1137–38.

nue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."

■ The general rule is that a ground for a refund that is neither specifically raised by a timely claim to the IRS for a refund, nor comprised within the general language of such claim, cannot be considered in a subsequent suit for a refund. The reasons for the variance rule are to prevent surprise and to give adequate notice to the IRS of the nature of the claim and the facts upon which it is predicated. This permits an administrative investigation and provides the IRS with an opportunity to correct error.[18]

■ Defendant's motions to dismiss are founded on the contention that the initial 1989 claims for refunds did not provide the grounds and supporting facts required by Treas.Reg. § 301.6402–2(b)(1). Defendant contends the refund claims fail to quantify the refund requested, fail to identify the legal justification for the refunds, fail to disclose facts material to entitlement to recover a refund, and fail to distinguish between "rail" and "nonrail" operations.

The narrative explanation in Box 11 of the 1989 initial refund claims[19] gave the IRS notice of the following:

1. With respect to its nonrail operations, Galveston Wharves is not an "em-

ployer" subject to the railroad retirement and railroad unemployment taxes.

2. Galveston Wharves seeks only to recover the portion of the railroad retirement and railroad unemployment taxes that were paid with respect to individuals engaged in nonrail operations.

3. Galveston Wharves is permitted to segregate its rail operations from its nonrail operations pursuant to Rev.Rul. 77–445, 1977–2 C.B. 357 and other authorities.

■ The explanatory statement is sufficient to give the IRS notice of the grounds and facts on which the refund claim was based, and is adequate for the purpose of bringing suit under I.R.C. § 7422(a). Long standing precedent in the Court of Claims has rejected defendant's contention as to the degree of specificity required in the supporting facts that accompany a refund claim. The Court of Claims in 1957 addressed the defense based on the issue of inadequacy of the claim for a refund, and stated:

Attorneys for the Government frequently ask us to apply to claims for refund a requirement of particularity almost as strict as is customarily applied to indictments for crime. The rule of strictissimi juris is not applicable to claims for refund. All that is required of them, as a predicate for suit in this court, is that they put the Commissioner of Internal Revenue on notice of the ground of the taxpayer's claim that his taxes were erroneously computed. This does not have to be stated with any greater particularity than is necessary to draw the Commissioner's attention to the claim he makes in his subsequent suit.[20]

---

**18.** *Union Pacific Railroad v. United States,* 389 F.2d 437, 447, 182 Ct.Cl. 103 (1968).

**19.** The entire narrative explanation on Form 843, Box 11, of the initial claims states:

Galveston Wharves hereby claims the amount shown in Box 6 or such greater sum as may be allowed by law and statutory interest. While the claim is for all railroad retirement taxes and railroad unemployment taxes paid, Galveston Wharves seeks only a recovery of the portion of these taxes paid with respect to individuals engaged in nonrail operations. Galveston Wharves was not an "employer"

subject to these taxes with respect to its nonrail operations. Pursuant to Rev.Rul. 77–445, 1977–2 C.B. 357 and other authorities, Galveston Wharves may segregate its rail operations from its nonrail operations. Once this segregation is completed and all individual employees have been identified, Galveston Wharves will contact the individual employees in accordance with Rev.Rul. 59–212, 1959–1 C.B. 692.

**20.** *National Forge & Ordnance Co. v. United States,* 151 F.Supp. 937, 941, 139 Ct.Cl. 204, 222 (1957).

Again, in 1982, the Court of Claims addressed the scope of Treas.Reg. § 301.6402–2(b)(1), as a supplement to I.R.C. § 7422(a), and noted that the regulation "distinguishes between the *ground* of a claim—that is, the legal theory upon which the refund is claimed—and *facts* 'sufficient to apprise the Commissioner of the exact basis thereof.' " [21] The Court of Claims identified three separable levels applicable to a claim for a tax refund: (1) the legal ground; (2) the ultimate fact; and (3) the supporting facts. Taxpayers are not required by regulation to recite in their refund claim the supporting facts with which the claimants intend to prove the ultimate fact.[22]

The Court of Claims interpreted Treas. Reg. § 301.6402–2(b)(1) as follows:

> The precision to which defendant urges that we now hold plaintiff goes wholly beyond that which is required by the Code or regulations. If a claim fairly apprises the Commissioner of the ground on which recovery is sought, then the claim is adequate for the purposes of bringing suit under section 7422(a). *Berner v. United States*, 151 Ct.Cl. 128, 140, 282 F.2d 720, 727 (1960); *National Forge & Ordnance Co. v. United States*, 139 Ct.Cl. 222, 223, 151 F.Supp. 937, 941 (1957).[23]

■ The remaining question is whether the court may resolve refund claims pursuant to summary judgment procedures and standards. RUSCC 56 provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrog- atories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Summary judgment is not a disfavored procedural short cut.[24] One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.[25] The summary judgment procedure serves judicial economy, it saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.[26]

A material fact is one which will make a difference in the result of a case.[27] The substantive law identifies the facts that are material. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[28] Doubts concerning factual issues are to be resolved in favor of the nonmovant.[29]

The fact that there are cross-motions for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other. Summary judgment is properly granted only when there is no genuine issue of material fact. Each party's motion must be evaluated on its own merits and care must be taken to draw all reasonable inferences against the party whose motion is under consideration. The party against which summary judg-

21. *Burlington Northern Inc. v. United States*, 684 F.2d 866, 870, 231 Ct.Cl. 222 (1982).

22. *Id.* 684 F.2d at 870.

23. *Id.* 684 F.2d at 869.

24. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987).

25. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

26. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984); *United States Steel Corp. v. Vasco Metals Corp.*, 394 F.2d 1009, 1011 (C.C.P.A.1968).

27. *See Curtis v. United States*, 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959).

28. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

29. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

ment is granted is not estopped by the filing of its own motion for summary judgment from asserting on review that there are genuine issues of material fact which prevent entry of judgment as matter of law against it.[30]

In this case, the parties have undertaken extensive and adequate discovery. The motion papers contain affidavits and exhibits that include a considerable volume of factual information which is used to support the respective proposed findings of uncontroverted fact. Defendant's statements of genuine issues as to plaintiff's proposed findings of uncontroverted fact do not put in issue the accuracy of Galveston Wharves' statistics as to assets, revenues, and employees, or its organizational structure and operations of its personnel. Defendant's objections are that, as a matter of law, there is no distinction between plaintiff as a port and plaintiff as a railroad, or that plaintiff's contentions are irrelevant, or are erroneous conclusions of law. Similarly, plaintiff's objections to defendant's proposed findings of uncontroverted fact do not put in issue the accuracy of factual information. Plaintiff's objections raise contentions of irrelevance, misleading analysis, cumulative statements, conclusory statements, or erroneous conclusions of law.

There is no genuine issue as to any material fact. On the basis of the facts in the motion papers, and argument of counsel, disposition of this case by summary judgment is appropriate.

This case resolves into the following issue of law: Whether plaintiff may amend its RRTA and RURT tax returns for the years 1985–87 when the information filed with the RRB is contrary to the information on the amended returns, and there has been no administrative determination by the RRB of a change in Galveston Wharves' status as an employer.

Congress has separated the railroad industry from all other industry for economic regulation, welfare of employees, and regulation of labor relations. The "railroad world" has been described as a "state within a state."[31] This system of retirement, disability, and unemployment benefits for persons who pursue careers in the railroad industry provided by the RRA and RUIA in their present form, has been under development since 1934 (retirement benefits) and since 1938 (unemployment compensation). Both employees and carriers pay a federal tax under the RRTA which funds a Railroad Retirement Account. The RRB disburses benefits from the Account to each eligible individual.[32]

In many respects the RRA resembles both a private pension program and a social welfare plan. The Supreme Court described the railroad retirement system as follows:

It provides two tiers of benefits. The upper tier, like a private pension, is tied to earnings and career service. An employee to be eligible for benefits, must work in the industry 10 years. Absent disability, no benefit is paid, however, until the employee either reaches age 62 or is at least 60 years old and has completed 30 years of service. 45 U.S.C. § 231a(a)(1). Like a social welfare or insurance scheme, the taxes paid by and on behalf of an employee do not necessarily correlate with the benefits to which the employee may be entitled. Since 1950, the Railroad Retirement Account has received substantial transfers from the social security system, and legislative changes made in 1974 were expected to require a one-time infusion of $7 billion in general tax revenues.

The lower, and larger, tier of benefits corresponds exactly to those an employee would expect to receive were he covered by the Social Security Act. 45 U.S.C. § 231b(a)(1). The Act provides special benefits for the children or parent of a worker who dies. §§ 231a(d)(1)(iii) and

---

**30.** *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

**31.** *California v. Taylor,* 353 U.S. 553, 565, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034 (1957).

**32.** *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 574, 99 S.Ct. 802, 804–05, 59 L.Ed.2d 1 (1979).

(iv). It also makes detailed provision for a worker's spouse; the spouse qualified for an individual benefit if the spouse lives with the employee, and receives regular contributions from the employee for support, or is entitled to support from the employee pursuant to a court order. § 231a(c)(3)(i). The benefits terminate, however, when the spouse and the employee are absolutely divorced. § 231d(c)(3).

Like Social Security, and unlike most private pension plans, railroad retirement benefits are not contractual. Congress may alter, and even eliminate, them at any time.[33]

The taxes on employees and carriers under RRTA, and the taxes on employers under RURT, are earmarked to fund the retirement, unemployment and disability benefits payable under the RRA and the RUIA. The statutes that provide the benefits to railroad employees and the statutes that provide the supporting taxes are parts of the same legislative scheme. They are two sides of the same coin.[34]

Although the RRB administers the employee benefits system, and the IRS administers tax collections that support the system, the statutory scheme is highly integrated. At least since 1954, amendments that deal with the benefits administered by the RRB and the resulting impact on taxes are combined in the same legislative packages, in both the statutes and committee reports.[35]

The interrelatedness of the benefit program to amendments to the IRC and to IRS regulations relative to tax collections is highlighted by the problems dealt with in the Railroad Retirement Solvency Act of 1983.[36] Railroad workers receive unemployment benefits under the RUIA, funded by contributions by the carriers to the Railroad Unemployment Insurance Trust Fund. When contributions are insufficient to pay railroad employment benefits, the program can borrow from the railroad retirement account. For 21 of the 26 years preceding 1982, the unemployment fund had to borrow from the retirement system. Such borrowing, coupled with nonpayment of the borrowed funds, resulted in a crisis in 1982: a shortfall was expected in the retirement fund by 1983. The expected shortfall resulted in legislation to insure the solvency of both the railroad retirement and the railroad employment accounts administered by the RRB. The Railroad Retirement Solvency Act of 1983 was the result. In addition to provisions relative to the retirement system and administration of the railroad unemployment system, the Solvency Act sought to provide for the repayment of funds borrowed by the unemployment system which had not been repaid. Section 231 of the Solvency Act added Chapter 23A to the IRC of 1954, to provide for the imposition of the Railroad Unemployment Repayment Tax (RURT). This was an excise tax on railroad employers with respect to having individuals in their employ as well as a tax on the income of employee representatives.[37] The RURT (I.R.C. §§ 3321–23) was combined in the same legislative package with other amendments to the benefit system, in the same statute and committee reports.[38]

Galveston Wharves acknowledges it was a rail carrier during 1985–87 with respect to its terminal railway operations, and does not seek a refund of RRTA or RURT taxes

---

**33.** *Hisquierdo v. Hisquierdo,* 439 U.S. at 574–75, 99 S.Ct. at 804–05 (footnotes omitted).

**34.** *Standard Office Bldg. Corp. v. United States,* 819 F.2d 1371, 1373 (7th Cir.1987).

**35.** *See e.g.,* Pub.L. No. 746, 83d Cong., 2d Sess., 68 Stat. 1038 (approved Aug. 31, 1954); S.Rep. No. 2222, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Admin.News 3661–83 (S.Rep. No. 2222 on H.R. 7840 by the Committee on Labor and Public Welfare).

**36.** Pub.L. No. 98–76, 97 Stat. 411, 426 (1983).

**37.** The foregoing explanation is provided in T.D. 8105, 1986–2 C.B. 192 (RURT Temporary regulations) and in T.D. 8227, 1988–2 C.B. 343 (RURT Final regulations).

**38.** *See* Railroad Retirement Solvency Act of 1983, Pub.L. No. 98–76, 97 Stat. 426; H.Rep. No. 98–30, *reprinted in* 1983 U.S.Cong. & Admin. News 813–45 (H.R.Rep. No. 98–30, Part 2 on H.R. 1646 by the Committee on Ways and Means).

paid with respect to such operations. Galveston Wharves, however, denies that it was an employer subject to those taxes, or that its employees were creditable under the RRA or RUIA, with respect to its port operations.

I.R.C. § 3231(a) defines an "employer" subject to the RRTA as "any carrier as defined in subsection (g)" and any company which is directly or indirectly owned or controlled by one or more of such carriers and which performs any service in connection with transportation by railroad or handling or property transported by railroad.[39] Subsection (g) defines "carrier" as a rail carrier providing transportation that is subject to the Interstate Commerce Act.[40] The Interstate Commerce Commission has jurisdiction over transportation by rail carrier.[41]

The RURT defines the term "rail employer" as any person who is an employer as defined in the RUIA.[42] Any rulings interpreting the term "employer" under RRTA, RRA and RUIA necessarily extends to the RURT. The definitions of "employer" and "employee" in the RRA and the RUIA cover the same persons as are covered by the RRTA and the RURT.[43]

I.R.C. § 3201 imposes tier 1 and tier 2 taxes on the income of each employee. I.R.C. § 3231(b) defines "employee" as any individual in the service of one or more employers for compensation.[44] I.R.C. § 3221 specifies the rate of tax that is imposed on employers with respect to tier 1 and tier 2. The tax is an excise tax equal to a stated percentage of compensation paid during the calendar year.[45]

**39.** 26 U.S.C. § 3231(a) provides in part:

(a) **Employer.**—For purposes of this chapter, the term "employer" means any carrier (as defined in subjection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the property or operating all or any part of the business of any such employer; except that the term "employer" shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power....

**40.** 26 U.S.C. § 3231(g) provides:

(g) **Carrier.**—For purposes of this chapter, the term "carrier" means an express carrier, sleeping car carrier, or rail carrier providing transportation subject to subchapter I of chapter 105 of title 49.

**41.** 49 U.S.C. § 10501(a)(1) provides:

§ 10501. General Jurisdiction
(a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation—

(1) by rail carrier, express carrier, sleeping car carrier, water common carrier, and pipeline carrier that is—
(A) only by railroad;
(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment; or
(C) by pipeline or by pipeline and railroad or water when transporting a commodity other than water, gas, or oil; ...

**42.** 26 U.S.C. § 3323(a).

**43.** *See* 45 U.S.C. §§ 231(a) and (b); and 45 U.S.C. §§ 351(a) and (d).

**44.** 26 U.S.C. § 3231(b) in part provides:

(b) **Employee.**—For purposes of this chapter, the term "employee" means any individual in the service of one or more employers for compensation; except that the term "employee" shall include an employee of a local lodge or division defined as an employer in subsection (a) only if he was in the service of or in the employment relation to a carrier on or after August 29, 1935....

**45.** 26 U.S.C. § 3221 in relevant part provides:

(a) **Tier 1 Tax.**—In addition to other taxes, there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentage of compensation paid during any calendar year by such employer for services rendered to such employer: * * * * *
(b) **Tier 2 Tax.**—In addition to other taxes, there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentage of compensation paid during any calen-

I.R.C. § 3221(c) provides for an additional tax at such rates that will make available funds to meet the obligation to pay supplemental annuities provided under the RRA. The RRB determines rates for such taxes for each calendar quarter, and the RRB determinations are published in the Federal Register.[46] Returns under the RRTA after 1975 are for calendar year periods, and Form CT-1 is prescribed.[47] Returns under the RURT with respect to the total rail wages paid by a rail employer also are on Form CT-1.[48] The information reported on these forms reflects the employer status as determined by the RRB, and creditable employee compensation as determined by the RRB.

Galveston Wharves in its amended returns seeks to separate its status as a covered railroad employer and its employees engaged in nonrail (or port) operations, from its status as a carrier and its employees engaged in rail carrier operations. In the statutory scheme, the RRB is the agency authorized to administer the RRA and RUIA and to determine the coverage as to employers and employees. The RRB has promulgated regulations to deal with the problem of coverage in situations where

noncarrier business is combined with carrier business.[49]

The Treasury Regulations applicable to the RRTA and the RURT do not deal specifically with segregation of carrier business from noncarrier business. In a private letter ruling and in a General Counsel Memorandum, the IRS has applied the RRB's segregation standards from 20 C.F.R. § 202.9, which relate to railroad affiliates principally engaged in some other business. The General Counsel's Memorandum adopted for the IRS, subject to the coordinating procedure in IRM (11) 636.22, the RRB standards in 20 C.F.R. § 202.9 for use in determining whether a controlled company is an employer within the meaning of I.R.C. § 3231(a).[50] Private IRS rulings and General Counsel Memoranda are not binding precedent. They may evidence an administrative practice.[51]

Regulations applicable to a determination to segregate have been included in the RRB administrative procedure since 1939.[52] RRB's 1941 determination letter applied its regulation section 202.3 to segregate the City and its employees from the rail carrier operations of Galveston Wharves. Decisions by the RRB in application of its seg-

---

dar year by such employer for services rendered to such employer: * * * * *

**46.** 26 U.S.C. § 3221(c) in part provides:

(c) In addition to other taxes, there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, for each man-hour for which compensation is paid by such employer for services rendered to him during any calendar quarter, at such rate as will make available sufficient funds to meet the obligation to pay supplemental annuities at the level provided under section 3(j) of the Railroad Retirement Act of 1937 as in effect on December 31, 1974 and administrative expenses in connection therewith. For the purpose of this subsection, the Railroad Retirement Board is directed to determine what rate is required for each calendar quarter. The Railroad Retirement Board shall make the determinations provided for not later than fifteen days before each calendar quarter. As soon as practicable after each determination of the rate, as provided in this subsection, the Railroad Retirement Board shall publish a notice in the Federal Register, and shall advise all employers, employee representatives, and the Secretary, of the rate so determined. With respect to daily, weekly, or

monthly rates of compensation such tax shall apply to the number of hours comprehended in the rate together with the number of overtime hours for which compensation in addition to the daily, weekly, or monthly rate is paid. With respect to compensation paid on a mileage or piecework basis such tax shall apply to the number of hours constituting the hourly equivalent of the compensation paid.

**47.** 26 C.F.R. § 31.6011(a)-2.

**48.** 26 C.F.R. § 31.6011(a)-3A.

**49.** 20 C.F.R. § 202.3—Company or person principally engaged in noncarrier business. 20 C.F.R. § 202.9—Controlled company or person not principally engaged in service or operation in connection with railroad transportation.

**50.** Rev.Rul. 77-445, 1977-2 C.B. 357; G.C.M. 38,078 (Sept. 5, 1979).

**51.** *See Rowan Companies, Inc. v. United States,* 452 U.S. 247, 261 n. 17, 101 S.Ct. 2288, 2296 n. 17, 68 L.Ed.2d 814 (1981).

**52.** 4 Fed.Reg. 1478 (Apr. 7, 1939).

regation regulations are reviewable judicially.[53]

The redesignation of Galveston Wharves' status as an employer so as to separate its rail carrier operations from its nonrail operations would involve a new application to plaintiff's port activities of the RRB standards established in 20 C.F.R. § 202.3. Section 202.3 applies to companies that are principally engaged in noncarrier operations, but in addition engage in some carrier business. The RRB procedure requires submission of information needed to determine whether the company is an employer with respect to some identifiable operations. Examples of matters to be considered by the RRB in reaching a determination are identified.[54] Another section of the RRB regulation, 20 C.F.R. § 202.9, deals with segregation problems of affiliated companies. The examples of matters to be considered in an RRB determination of employer status are different in § 202.9.[55]

Treasury regulations do not provide a mechanism for a determination that some part of a carrier's operations may be exempted from the RRTA or the RURT on the basis of RRB segregation standards. Counsel have not cited, and research has not found, any provision of the Treasury regulations applicable to the RRTA and the RURT that deal with the segregation issue.[56] Galveston Wharves has not cited any IRS decision that allows segregation in circumstances where 20 C.F.R. § 202.3 standards would apply, nor has any court decision that validates a segregation determination made by the IRS been cited.

The RRB was created and is authorized specifically to administer the railroad employee retirement system. The matters the RRB is to consider pursuant to § 202.3 when an application is made for a segrega-

---

**53.** *Adams v. RRB*, 214 F.2d 534 (9th Cir.1954) (RRB overturned in 1950 a decision it had made in 1942 relative to Carrier Taxing Act coverage of certain employees of companies affiliated with a carrier. On appeal, the RRB 1950 decision was reversed and remanded for further proceedings under the standards in RRB regulation § 202.9).

**54.** 20 C.F.R. § 202.3 provides:

(a) With respect to any company or person principally engaged in business other than carrier business, but which, in addition to such principal business engages in some carrier business, the Board will require submission of information pertaining to the history and all operations of such company or person with a view to determining whether some identifiable and separable enterprise conducted by the person or company is to be considered to be the employer. The determination will be made in the light of considerations such as the following:

(1) The primary purpose of the company or person on and since the date it was established;

(2) The functional dominance or subservience of its carrier business in relation to its non-carrier business;

(3) The amount of its carrier business and the ratio of such business to its entire business;

(4) Whether its carrier business is a separate and distinct enterprise.

(b) In the event that the employer is found to be an aggregate of persons or legal entities or less than the whole of a legal entity or a person operating in only one of several capac-

ities, then the unit or units competent to assume legal obligations shall be responsible for the discharge of the duties of the employer.

**55.** 20 C.F.R. § 202.9 provides the RRB determination will be made

"in the light of considerations such as the following:

(1) The primary purpose of the company or person on and since the date it was established;

(2) The functional dominance or subservience of its business which constitutes a service or operation of equipment or facilities in connection with the transportation of passengers or property by railroad in relation to its other business;

(3) The amount of its business which constitutes a service or operation of equipment or facilities in connection with the transportation of passengers or property by railroad and the ratio of such business to its entire business;

(4) Whether such service or operation is a separate and distinct enterprise;

(5) Whether such service or operation is more than casual, as that term is defined in § 202.6.

**56.** 26 C.F.R. part 31—Employment Taxes and Collection of Income Tax At Source. Subpart C contains regulations applicable to the RRTA; subpart D contains regulations applicable to the RUIA (§ 31.3306(c)(9)–1); and subpart G contains administrative provisions, *see* §§ 31.6001–3; 31.6011(a)–2; 31.6011(a)–3A; 31.6011(a)–6(a)(2); 31.6051–1(f); 31.6302(c)–2; 31.6302(c)–2A; 31.6402(a)–2; 31.6413(a)–1.

tion of railroad operations are central to its responsibilities. Such matters are singularly within the area of expertise of the RRB. Galveston Wharves by its amended returns would have the IRS apply the RRB standards to facts that never had been presented to, or ruled upon, by the RRB. In this case, Galveston Wharves requests this court to apply the RRB standards in 20 C.F.R. § 202.3 to facts on which no decision has been made by the RRB. The factual information and the argument that Galveston Wharves has presented to the IRS and to this court is contrary to the information and representations presented to the RRB during Galveston Wharves' appeals from the RRB General Counsel legal opinions L–88–5 and L–88–107. The appeals proceeded on the basis that until November 4, 1987, Galveston Wharves was an employer as to its employees, and all of its employees were covered employees.

Galveston Wharves may not be heard to claim that it was not aware until 1989 that 20 C.F.R. § 202.3 procedures were not available to segregate its rail operations from its port operations. The 1941 RRB rulings may not be ignored. Further, a memorandum dated November 23, 1966, addressed to the senior management of Galveston Wharves, summarized a meeting on November 17, 1966, with RRB personnel "to discuss the establishment of a separate railroad department under our present management organization and the effect of such separate department on railroad retirement and railroad unemployment coverage of the non-railroad employees." The memorandum includes the following paragraph:

If we are able to get a favorable ruling from the Railroad Retirement Board we can realize the tax savings earlier projected. I presume we can also effect the separation as far as the Interstate Commerce Commission is concerned and may well be able to escape the jurisdiction of the Federal Employee's Liability Act with regard to the non-railroad employees.

On February 29, 1968, an attorney representing Galveston Wharves sent a letter to the RRB general counsel that referred to a previous visit concerning the problems of the Galveston Wharves. The February 29, 1968 letter states:

The City of Galveston owns the dock and related facilities and operates these through a Board called the Board of Trustees of the Galveston Wharves. Included in these operations is approximately 50 miles of railroad tracks, which are operated by Galveston Wharves personnel. The railroad operations are only approximately 15% of the gross business of the Galveston Wharves, and the great majority consists of other operations, including the operation of the docks and wharves.

We are contemplating forming a separate corporation and this separate corporation will lease and operate the railroad facilities. We are desirous of knowing whether by doing this we will accomplish the purpose of eliminating the remainder of the employees of the Galveston Wharves from the provisions of the Railroad Retirement Act. We would greatly appreciate you considering this matter and your letting us know whether this will accomplish that purpose.

On March 20, 1968, additional information, which had been requested by telephone, was supplied to the RRB general counsel. This information included: a statement that railroad operations revenue in 1967 amounted to 13.8 percent of total Galveston Wharves revenue; and statements that the number of railroad employees was 81, the payroll for railroad operations in 1967 was $517,353, and, if the railroad were separated, the balance of the payroll would have been $1,554,712.

It is not clear whether the 1968 correspondence was the product of informal discussions with RRB staff, or a formal submission to the Board. In any event, plaintiff did not pursue the matter at the RRB. No formal determination under 20 C.F.R. § 203.3 was made by the RRB.[57]

---

**57.** Reasons for Galveston Wharves' abandonment of this matter are not stated in the record.

In view of General Counsel Legal Opinions L–88–5 and L–88–107, Galveston Wharves may

Application of the RRB regulation § 202.3 elements is not administratively within IRS collection responsibilities under the RRTA or the RURT. It is not the province of the IRS to make an initial determination on the 20 C.F.R. § 202.3 type information as it pertains to the railroad industry. The IRS function in the collection of taxes necessary to fund railroad retirement, disability and unemployment benefits is to apply the tax to information that has been reported to the RRB as a result of determinations made by the RRB.

The information Galveston Wharves presented to the IRS in its amended returns should have been presented to the RRB. In the absence of a determination by the RRB pursuant to the procedure authorized in 20 C.F.R. § 202.3, such information cannot be considered by the IRS, and this court cannot make a determination as to Galveston Wharves' eligibility for a refund of taxes paid pursuant to the RRTA and the RURT.

On the basis of the foregoing:

Defendant's motions to dismiss are DENIED; plaintiff's motion for summary judgment is DENIED; defendant's cross-motion for summary judgment is ALLOWED.

The Clerk is directed to dismiss the complaint. Costs to defendant.

have learned informally that further pursuit of the request would be unproductive.