The CITY OF GALVESTON, TEXAS acting By and Through the BOARD OF TRUSTEES OF the GALVESTON WHARVES, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 522–89T.

United States Court of Federal Claims.

July 17, 1995.

Brian J. McKenna, Chicago, IL, of record, for plaintiff. Benjamin R. Powel and McLeod, Alexander, Powel & Apffel, of counsel.

George L. Squires, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant. David Gustafson, of counsel.

## OPINION

HARKINS, Senior Judge.

The City of Galveston, Texas, in a complaint, filed September 22, 1989, seeks a refund of employment taxes paid for calendar years 1985–87 under the Railroad Retirement Tax Act (RRTA)[1] and the Railroad Unemployment Repayment Tax (RURT).[2] During the period the employment taxes were paid, the Board of Trustees of the Galveston Wharves (Galveston Wharves) was

---

1. 26 U.S.C. §§ 3201 et seq. (1988).

2. 26 U.S.C. §§ 3321 et seq. (1988).

the unit of the City responsible for managing its Port of Galveston properties.

Proceedings on this tax refund claim have been protracted, and every stage has been vigorously contested. The complaint was amended on November 4, 1993, and defendant's answer was amended on August 24, 1990, to assert an alternative claim to an offset. Defendant initially moved to dismiss for lack of subject matter jurisdiction, or alternatively, for failure to state a claim upon which relief may be granted, and these issues were resolved in an opinion on cross-motions for summary judgment filed February 26, 1991.[3] That opinion granted summary judgment to defendant on the ground that the segregation of personnel in rail operations from personnel on Galveston Wharves port operations was within the primary jurisdiction of the Railroad Retirement Board (RRB) and that it was not the province of the IRS to make an initial determination on the elements of the RRB segregation regulations as applicable to the railroad industry.

On appeal, the Federal Circuit on October 28, 1991, reversed and remanded. The Federal Circuit held that the IRS, in determining tax liability under the RURT and the RRTA, is not precluded from independently determining the availability of segregation for the City of Galveston despite the absence of a similar determination by the RRB under the Railroad Retirement Act (RRA),[4] or the Railroad Unemployment Insurance Act (RUIA).[5]

After remand, the parties on December 31, 1991, recommended plaintiff's claim could be determined under summary judgment procedures, after discovery on the segregation issue. It was agreed the issues to be resolved pursuant to the October 28, 1991, remand by the Federal Circuit were: (a) the availability of segregation for the City of Galveston, and (b) the availability of offsets as presented in defendant's August 24, 1990, amended answer. These issues were to be independently determined by the IRS, with the IRS free to consider information on the segregation issue not presented to the RRB. The RRB standards established in 20 C.F.R. § 202.3

were to apply in a determination of the segregation issue. Settlement was encouraged.

On February 24, 1992, plaintiff presented a draft of a proposed settlement, and in the course of settlement negotiations presented a revised proposal on April 27, 1993. The RRB did not participate in settlement discussions and the parties were unable to agree upon all material facts. Efforts to resolve the case on summary judgment procedures were abandoned on August 12, 1993. Discovery was completed on September 1, 1993; RCFC Appendix G pretrial procedures were completed on January 10, 1994; trial was held January 11 to January 21, 1994; and posttrial briefing was completed on August 8, 1994.

Documentary evidence in the trial record relative to the sequence of actions and factual background of plaintiff's refund claim verified the facts recited in the February 26, 1991, summary judgment opinion. Accordingly, those facts are repeated here only as necessary to provide perspective or to illuminate the factors that control disposition of contested issues.

Prior to November 30, 1940, the terminal and switching railroad and the deep water port facilities at Galveston were owned and operated by private commercial interests. By that time, all of the port facilities were owned by Galveston Wharf Company (GWC). GWC was a "carrier-employer" within the meaning of the RRA and the RUIA whose operations were performed under tariffs filed with the Interstate Commerce Commission (ICC). Since 1905, the City had owned 6,222 shares of stock and an undivided one-third interest in the property of GWC.

During the period 1935–39 and the first 9 months of 1940, GWC income accounts to the ICC showed net income, after payment of interest on funded debt and other fiscal charges, was either at a deficit or below requirements. The ICC found its record showed that GWC had been unable to refund its outstanding bonds satisfactorily. The

**3.** *City of Galveston v. United States*, 22 Cl.Ct. 600 (1991).

**4.** 45 U.S.C. §§ 231 et seq.

**5.** 45 U.S.C. §§ 351 et seq.

City believed that it could operate the properties in a profitable manner because it could borrow money at a lower interest charge and because there would be substantial savings in federal income taxes if the City owned the properties.

GWC, in 1940, owned and operated about 4.26 miles of main tracks and about 40 miles of miscellaneous tracks on Galveston Island. It owned eight steam switching locomotives, a few units of work equipment, and practically all the improved waterfront properties in the City, including wharves, warehouses, and an elevator. Connections for the interchange of carload traffic were made with the six railroad lines serving Galveston. GWC handled no passenger traffic and the principal commodities handled were products of agriculture, animals and mines. During the period 1935–39, GWC reported to the ICC that its coastwise inbound traffic totaled 1,360,043 tons and its coastwise outbound traffic totaled 5,027,022 tons. During the same period, GWC reported to the ICC that its foreign inbound traffic totaled 984,290 tons, its foreign outbound traffic totaled 5,618,003 tons, and its foreign local traffic totaled 1,236,008 tons.

One hundred percent of the foreign inbound traffic arrived by ship; one hundred percent of the foreign outbound traffic left by ship. All outbound traffic reported to the ICC arrived at Galveston Wharves piers by railroad. The record does not contain a breakdown of traffic in 1940 allocable to truck transportation.

The City wanted to acquire the properties of GWC to gain ownership of the waterfront properties. Its chief concern, however, was to acquire and operate those properties so as to be able to compete with other municipally-owned facilities on the Gulf of Mexico.

After it applied for and obtained ICC approval to acquire and operate the line of railroad and other properties, the City, on November 30, 1940, purchased the properties of GWC and, as a result, attained the status of a commercial carrier by rail. To pay for this transaction, the City returned for cancellation its 6,222 shares of GWC stock, and issued to GWC $6,250,000 in revenue bonds payable to principal and interest solely from the revenues of the properties acquired and secured by a mortgage on those properties. The revenue bonds consisted of Series A bonds, payable in installments to August 1, 1965, and Series B bonds, payable in installments to August 1, 1990.

Acquisition of the GWC properties and issuance of the revenue bonds was authorized by a city ordinance adopted October 17, 1940. The ordinance provided that the wharf and terminal properties were set apart and designated as a separate utility to be known as "Galveston Wharves." It was to be fully managed, controlled, maintained and operated by a board of trustees. The official title of the separate utility was "Board of Trustees of the Galveston Wharves." Effective December 1, 1940, GWC was dissolved and GWC's President and Board of Directors became the utility's Board of Trustees, and the management officers of GWC became management officers of Galveston Wharves. Tariffs of GWC were adopted by the Board of Trustees of the Galveston Wharves effective December 9, 1940. The wharf and terminal properties, and all of the utility's personnel, continued to operate under the jurisdiction of the ICC and the RRB.

On June 2, 1941, the RRB determined that, because the City was the successor to GWC and the legal entity capable of assuming obligations and charged by the ICC with the duty of operating railroad properties, the City was responsible for the Board of Trustees of the Galveston Wharves' duties as an employer under the RRA and the RUIA. The RRB segregated the carrier business conducted by the Board of Trustees and its operating personnel from the City's other functions and activities conducted by other City employees. The RRB's segregation determination resulted in the following: in its activities other than those conducted by the Board of Trustees, the City was not an employer under the railroad Acts; the Board of Trustees of the Galveston Wharves was an employer within the meaning of the Acts from December 1, 1940.

From December 1940 until November 4, 1987, the Board of Trustees of the Galveston Wharves controlled operations of the facili-

ties and properties of the port. From 1940 through November 4, 1987, the Board of Trustees of the Galveston Wharves reported itself to the RRB, for purposes of the RRA, and to the IRS, for purposes of the RRTA, as an employer for all of its employees. The Galveston Wharves reported and paid federal employment taxes as an "employer" subject to the RRTA.

During the years in issue, the port facilities handled traffic from the six railroad lines serving Galveston as well as traffic arriving by truck. The railroads would deliver cars loaded with cargo for export to be transferred to ships, and would deliver empty rail cars to receive imported cargo. Approximately 75 to 80 percent of the tonnage coming into or leaving the port facilities by land did so by rail.

The record is incomplete as to tonnage information relative to total freight traffic handled by Galveston Wharves during the years in issue. Nor does the record contain complete information on tonnage of traffic coastwise or foreign, or by character of commodities handled.[6] The record does not contain statistics that establish the breakdown of traffic in the years in dispute allocable to truck transportation.

The operation of the port by the Board of Trustees of the Galveston Wharves resulted in losses of $4,172,724 for the year 1985, $5,503,134 in the year 1986, and $3,739,705 in the year 1987. The independent public accountants, employed by the Board of Trustees of the Galveston Wharves to audit the financial statements, included in their audit reports for 1986 and 1987 qualified opinion letters which noted that as a result of diminished cash flow, cash restricted for debt service was used to make current payments on funded debt. Cash restricted for debt service was diminished by $1,562,508 in 1986 and by $286,035 in 1987. The use of restricted funds for this purpose violated the City's bond ordinance. The auditors' reports cautioned that if this use of restricted funds continued and the ability to service the long term debt seriously impaired, the continued existence of Galveston Wharves in its present organizational form may be seriously impaired.

During the years in issue, the principal officers of Galveston Wharves were actively involved in the functions of various organizations that were concerned with issues of interest to port authorities. Galveston Wharves was a member of the following organizations: the American Association of Port Authorities—a nationwide trade association; Gulf Seaports Marine Terminal Conference—an organization that enabled its members to confer and discuss the rates, rules and regulations of marine terminal operations; Gulf Ports Association—a regional organization of public seaport agencies concerned with legislative issues affecting port authorities; and Texas Ports Association—a statewide organization of Texas seaport agencies concerned with legislative issues affecting port authorities.

During the years in issue, the auditors' reports to Galveston Wharves showed operating revenues as follows:

| Source | 1985 | 1986 | 1987 |
|---|---|---|---|
| Switching | $3,339,579 | $2,680,835 | $4,859,438 |
| Car repairs | -0- | 16,364 | 116,705 |
| Wharfage | 2,491,231 | 2,004,045 | 1,573,311 |
| Dockage | 3,007,395 | 3,319,693 | 2,764,417 |

6. The audit report for 1985 contained a table of tonnage handled over facilities owned by Galveston Wharves during the period 1981–85. In 1985, the total inward, outward, internal tonnage handled through the facilities was 5,052,859 short tons. Bulk cargoes (mostly grain and sugar), and sacked grain flour and rice accounted for 4,203,241 tons (83.2 percent); cotton, plywood, bananas and other general cargo accounted for 408,724 tons (8.1 percent); and container-ized cargo accounted for 440,894 tons (8.7 percent). The record does not contain comparable statistical information for 1986 and 1987.

The minutes of the regular meeting of the Board of Trustees of the Galveston Wharves held June 28, 1988, show that the General Manager reported total tonnage for May 1988 of 1,025,-474, and for May 1987 of 244,551. This was an increase of 419 percent.

| Source | 1985 | 1986 | 1987 |
|---|---|---|---|
| Loading and unloading | 2,066,529 | 1,385,708 | 399,719 |
| Container Terminal | 228,300 | 233,055 | –0– |
| Equipment Rental | 364,496 | 412,308 | 429,728 |
| Stuffing and stripping | 38,703 | 11,594 | 3,683 |
| Storage Freight | 18,430 | 1,553 | 21,354 |
| Shed hire | 313,077 | 247,245 | 195,844 |
| Revenue producing services | 113,282 | 119,998 | 122,195 |
| Rentals | 1,060,280 | 1,114,725 | 1,157,135 |
| Miscellaneous | 216 | 10,944 | 4,684 |
| **Total Operating Revenues** | **$13,041,518** | **$11,558,067** | **$11,648,213** |

In 1987, the port facilities on the north side of Galveston Island extended from 10th Street on the East to 41st Street on the West. These facilities included 24 piers, numbered 10 through 41, of which only two (Nos. 37 and 38) did not contain railroad tracks. The piers had berthing capacity for a total of 32 vessels. There were two elevators with a total storage capacity of 9 million bushels, and eight warehouses with a total area of 1,057,224 square feet. The 45 miles of railroad tracks provided transportation connections to the piers, the elevators, and to all warehouses.

The payroll records maintained by the Board of Trustees for the Galveston Wharves include the following information:

| | 1985 | 1986 | 1987 |
|---|---|---|---|
| Total Employees | 381 | 429 | 233 |
| Railroad Payroll | 84 | 86 | 69 |
| Total RRTA Withheld | $585,191.89 | $568,076.03 | $409,181.25 |
| Total RURT Withheld | — | $724,044.35 | $1,194,836.17 |

On October 20, 1987, the Board of Trustees of Galveston Wharves and Galveston Railway, Inc. (GRI) executed a memorandum that provided procedures applicable to a proposed sale of railroad equipment, and the lease of rail lines and right of way owned by the City to GRI. GRI was a Texas corporation authorized to do business as a common carrier in Texas. It was an independent corporation unrelated to the City, to the Board of Trustees of the Galveston Wharves, or to its management personnel.

The procedural memorandum recited that the parties had executed, on that date, a Lease Agreement, a Bill of Sale, and a Security Agreement, and that GRI had executed a Promissory Note. All of these documents were to "constitute one transaction to be simultaneously consummated." The Lease Agreement was to "become effective when approved" by the ICC, which approval was expected to become effective in 8 days. Items 4, 5 and 6 provided:

4. · It is agreed that the Bill of Sale, Note and Security Agreement shall be held in escrow by Wharves until such date of approval of the Lease Agreement, upon which date GRI shall pay to Wharves the cash consideration of $320,005.00, the Bill of Sale shall be delivered to GRI and the Note and Security Agreement delivered to Wharves.

5. Absent such payment and delivery of documents described in Paragraph 4 hereof, the Lease Agreement shall be null and void, and the parties agree to take all actions necessary to complete the recorded rescission thereof with any necessary regulatory approvals.

6. Absent the approval of the Lease Agreement, the sale of railroad equipment to GRI shall not take effect, and Wharves shall retain the Bill of Sale and return to GRI the Note and Security Agreement.

On October 20, 1987, GRI filed a verified notice of exemption with the ICC pursuant to 49 C.F.R. §§ 1150.31–34. In this procedure, to reduce regulatory delay and costs in transfers of rail lines from an existing rail line to noncarriers, the ICC automatically exempts the transfers effective 7 days after the filing of a verified notice disclosing details about the transaction. The application contained a description of the transaction that stated GRI would acquire by purchase from Galveston Wharves locomotives and other railroad operating equipment, and by lease the unrestricted right to operate rail service over the tracks and appurtenant facilities in and around the Port of Galveston, Texas. The application also stated:

> After completion of the aforedescribed acquisitions, GRI plans to operate as a common carrier by rail, serving shippers located on and off the lines in origin, switching and delivery service, and through interchange with other carriers pursuant to tariffs filed with the Commission under 49 U.S.C. § 10761, *et seq.* and contracts entered into with shippers pursuant to 49 U.S.C. § 10713.

On October 29, 1987, the ICC approved, by taking no action, the sale/lease transaction. On November 4, 1987, Galveston Wharves leased to GRI the real property underlying its tracks, its track gang warehouse, the car inspector's tool room, the employee's change house, the office building lockers, the railroad engine house, the yard office building, the yard office furniture, and equipment, the yard office improvements, and the yard office computer system used in connection with operation of the railroad; and it sold to GRI its locomotives, equipment inventory and supplies used in connection with operation of the railroad.

By letter dated November 10, 1987, the Board of Trustees of the Galveston Wharves advised the RRB that it ceased to be a rail carrier on November 5, 1987, and that it was no longer eligible to participate in the railroad retirement and railroad unemployment systems. On January 15, 1988, the RRB Deputy General Counsel concluded in L–88–5 that GRI became an "employer" under the RRA and RUIA on November 5, 1987, and that the Board of Trustees of the Galveston Wharves became a lessor employer on that date and continued to be an employer under the Acts.

By letter dated April 6, 1988, accompanied by a 7-page brief, the Board of Trustees of the Galveston Wharves requested reconsideration of L–88–5. The attached brief, dated April 4, 1988, asserted that after November 5, 1987, Galveston Wharves ceased to be an employer. The brief admitted, however, that prior to that date it had been an employer. Nowhere was it suggested that Galveston Wharves had been an employer with respect to only some of its employees.

In a telephone conversation on May 23, 1988, with a member of the staff of the RRB Bureau of Law, Galveston Wharves notified the RRB that new counsel had been retained to handle the request for reconsideration of L–88–5. By letter dated June 7, 1988, the new counsel for Galveston Wharves confirmed arrangements made on June 6, 1988, with the RRB Deputy General Counsel for additional discovery and briefing relative to reconsideration of L–88–5. A 45-day period starting June 6th was allowed for filing additional evidence, and Galveston Wharves made a single supplemental filing on or before July 20, 1988. The June 6 meeting involved discussions of Galveston Wharves' position on two issues: (1) any obligation to operate the railroad in the event the lessee-operator failed, and (2) segregation pursuant to 20 C.F.R. § 202.3. On that issue, Galveston Wharves argued that the June 7, 1941, RRB order recognized that the City of Galveston was the legal entity charged by the ICC's November 28, 1940, order with the duty of operating railroad properties; that segregation was necessary to avoid having city fire fighters, policemen, and other city workers under the railroad retirement system; and that since Galveston Wharves, after November 5, 1987, no longer operated a railroad or employed railroad workers, it should be treated like the rest of the City of Galveston.

The July 20, 1988, supplemental brief addressed two issues: (1) whether the leasing of railroad tracks and right of way caused the lessor to be a "rail carrier providing transportation" for purposes of the RRA and the RUIA, and (2) whether the operation of a

public port authority by a city should be segregated from the activity of leasing railroad tracks and right of way owned by the city. The supplemental brief attached an affidavit by the General Manager—Port Director of the Port of Galveston on the employer status of the Board of Trustees of the Galveston Wharves, with nine exhibits. The affidavit included the following:

> The Board of Trustees of the Galveston Wharves is a separate utility so designated by provision of the City Charter of the City of Galveston, Texas. The Charter provides that all city-owned wharf and terminal properties and all income and revenue therefrom, are to be set aside, controlled, maintained and operated by a Board of Trustees of the Galveston Wharves. The entire port operations and physical facilities were placed under the control of the Board of Trustees on November 30, 1940. The primary purpose of the Galveston Wharves is to attract business to the Port of Galveston and foster economic growth in the City of Galveston.

On September 29, 1988, the RRB Bureau of Law issued its opinion on reconsideration in a 15–page opinion, L–88–107. The opinion stated:

> It has not been argued and no factual information has been supplied which would indicate that segregation could now be applied to an "identifiable and separable" part of the Board of Trustees of the Galveston Wharves, e.g., a separate department of the Wharves that oversees the administration of the Lease to GRI.

The opinion concluded that the Board of Trustees of the Galveston Wharves, because it was a lessor/employer on November 5, 1987, remained an employer under the RRA and the RUIA.

On appeal the RRB reversed the opinion in L–88–107. The RRB ruled that the Board of Trustees of the Galveston Wharves ceased to be a lessor/employer covered by the RRA and the RUIA effective November 5, 1987, as

a result of the sale/lease of its rail operations. The RRB distinguished Galveston Wharves' lease of only part of the railroad property from previous cases when the lessor companies had leased all of their assets to other entities. Galveston Wharves had sold all of its railroad equipment, and if the lease was terminated by either party, Galveston Wharves would no longer own the railroad equipment necessary to resume railroad operations. RRB Order 89–74 included the following statements:

> Furthermore, it appears that Galveston Wharves has leased, rather than sold, the railroad track and realty upon which it sits because those assets belong to the City of Galveston, a separate governmental body, and are not within the authority of Galveston Wharves to sell.

> \* \* \* \* \* \*

> As a practical matter, Galveston Wharves' sale and lease to GRI has removed it from its former status as the operator of a line of railroad. Having so removed itself from such operation, it has ceased to be an employer covered by the Acts, effective November 5, 1987.

### Discussion

#### I

In this case plaintiff seeks a refund of railroad employment taxes paid for operations during the period January 1, 1985, through November 4, 1987. In a tax refund case, the United States is in possession of plaintiff's money, and plaintiff must show that the taxes were wrongfully paid or exacted by the IRS in contravention of a statute or a regulation.[7] In its February 1990, amended claims for refund, plaintiff acknowledged that the RRTA/RURT taxes reported and paid for its employees which it classified as engaged in railroad operations were paid legally, in accordance with statutory and regulatory requirements.[8] There is no dispute that during the period January 1, 1985, through November 4, 1987, Galveston

---

7. *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967).

8. The 1990 amendments to plaintiff's claims for refunds were filed to negate jurisdictional defects

asserted in defendant's answer that were based upon the variance issue. *See City of Galveston,* 22 Cl.Ct. at 604, 607.

Wharves was a rail carrier "employer" subject to the ICC.

The RRB in its February 22, 1989, decision, did not address the employer status of Galveston Wharves, or the coverage of its employees engaged in other port operations, for the period January 1, 1985, through November 4, 1987. Plaintiff, in its requests for reconsideration of L–88–5 and L–88–107, addressed only the issue of plaintiff's status on and after November 5, 1987. None of the requests for reconsideration of the recommendations of the RRB Legal Division challenged any determination other than plaintiff's status as a lessor/employer on and after November 5, 1987. In all of the RRB proceedings, plaintiff's arguments, and the documents used in support of those arguments, concerned eligibility for segregation pursuant to 20 C.F.R. § 202.3, *after* a November 5, 1987, separation land and rights-of-way under a lease from the sale of physical equipment. Plaintiff's only objective in its argument on eligibility for segregation was to support a determination of non-liability for railroad employment coverage after November 5, 1987.

There is no dispute that prior to November 5, 1987, the City owned all of the land and rights-of-way used in railroad operations at the port. Nor is there any dispute that the Board of Trustees of the Galveston Wharves operated and was responsible for all railroad activity. Plaintiff's witnesses acknowledge that 75 to 80 percent of all tonnage handled through the port was railroad traffic. It is obvious that an operative railroad was central to the port's operations and that the Port of Galveston could not exist in the absence of the joinder of the real estate interests owned by the City and the personalty managed by the Board of Trustees of the Galveston Wharves. On said facts, the RRB would have jurisdiction over all Galveston Wharves employees under numerous ICC administrative decisions and judicial precedents.

Plaintiff's primary interest in the lease/sale transaction was a resolution of tax obligations under the RRTA and the RUIA. A satisfactory resolution of tax obligations could not be attained until the RRB analyzed

the lease agreement so that plaintiff no longer would be a carrier by railroad and an employer subject to the RRA or the RUIA. The October 20, 1987, procedural memorandum specifically provided that, absent approval of the Lease Agreement, the sale of the railroad equipment would not take effect. This compels the conclusion that until there was a final RRB determination, the entire lease/sale transaction could be called off. The October 29, 1987, ICC decision under 49 C.F.R. § 1150.3 in Finance Docket No. 31141 was not the controlling factor on the ability to call off the entire transaction.

Consideration of the lease/sale transaction under the RRB procedures took from November 10, 1987 (notice by the Board of Trustees of the Galveston Wharves to the RRB Bureau of Compensation and Certification) to the final RRB Order on February 22, 1989. During this entire period, in the event the final RRB decision turned out to be an unsatisfactory resolution of tax obligations under the RRTA and the RUIA, the transaction could be set aside and reversed. This continuing power to set aside the lease/sale transaction shows the parties intended to maintain the status quo until November 4, 1987. Up to that date, plaintiff intended to remain in the same reporting posture with respect to both the RRB and the IRS it had occupied since 1940. That is: plaintiff would continue to report, pay, and withhold railroad employment taxes with respect to all of its employees.

**II**

■ Entitlement to segregation of plaintiff's rail carrier personnel and activities from employees and activities in port operations requires: (1) clarification of the real parties in interest in this case; (2) examination of changes during the period 1940 to 1987 in the relationships, authority and practices of the relevant governmental bodies, and (3) analysis of the state of the record of proof for the positions asserted. The segregation issue is unique in that, except for the affected employees, interests involved are those of governmental bodies only. These governmental interests vary with the passage of time, both as to authority of each to act and in their

relationships to changing authority in other governmental organizations.[9] These matters are addressed in below.

For tactical purposes, defendant to preserve its claim to an offset and plaintiff to establish a legal separation from the City, counsel were unable to agree upon the identity of the plaintiff. Each filed last minute motions and supplied elaborate analyses in support of their respective positions.[10]

The complaint in paragraph 1 names as plaintiff the City of Galveston, Texas, a municipal corporation organized and operated pursuant to the Constitution and laws of the State of Texas. That paragraph also states the action is brought by The Board of Trustees of the Galveston Wharves, a separate utility and subunit of the City of Galveston which is referred to as "Galveston Wharves." Plaintiff argues the caption of the case is erroneous. Plaintiff would change it to "Galveston Wharves, a body politic and corporate." This change, plaintiff contends, would recognize that it was separate from the City, with specific enumerated powers.

During the period 1940–87, the name of the port operation varied in accordance with its usage. The official title used in litigation was like the caption in the complaint. The name "Board of Trustees of the Galveston Wharves" was the official title used in letterhead correspondence, in contracts, in applications to the ICC subsequent to June 2, 1941, in reports from its auditors to the City, in its published tariffs with the ICC, FMC, and Railroad Commission of Texas (RCT), and in employee reports to the RRB. These official references for convenience frequently would be shortened to "Galveston Wharves," "Wharves" or "GW." Reports and returns to the IRS, and amended Form 843 claims for refund were in the name of "Galveston Wharves."

In this litigation, the plaintiff that is seeking a refund of employment taxes is the City of Galveston, Texas. "The Board of Trustees of the Galveston Wharves" is the unit of the City responsible for managing the Port of Galveston properties. The name "Galveston Wharves" refers to the Board of Trustees of the Galveston Wharves.[11]

Whether a political subdivision of a municipality in Texas is a separate body politic depends on whether under Texas State statutes it is a distinct legal entity. The City of Galveston is a home rule city with powers granted under Texas Civil Statutes, Title 28, Cities, Towns and Villages. All powers of the City of Galveston are vested in an elected seven member council, which enacts legislation, adopts budgets, determines policies and appoints a city manager to execute the laws and administer the government of the City. The City may acquire property within or without its corporate limits for any municipal purpose. The City may sell, lease, mortgage, hold, manage, and control such property as owned or acquired.

The State statutes have specific provisions for cities on navigable waters, and for cities with harbor and port facilities.[12] Article 1187f, Harbor and Port Facilities, applies to every incorporated city or town of more than 5,000 inhabitants. Section 1 empowers such cities:

> ... to build, construct, purchase, acquire, lease as lessee, improve, enlarge, extend, repair, maintain, replace, develop, operate, lease, or cause to be built, constructed, purchased, acquired, leased improved, enlarged, extended, repaired, maintained, replaced, developed, or operated, any and all improvements and facilities necessary or convenient for the proper operation of the ports or harbors of such city. These pow-

---

9. These governmental instrumentalities include: State of Texas; City of Galveston; Board of Trustees of the Galveston Wharves; Treasury Department, Office of the Secretary; IRS; Department of Health and Human Services, Office of the Secretary; Federal Security Administration; ICC; RRB; FMC; and Department of Transportation, Federal Maritime Administration.

10. Trial of this case was scheduled on Aug. 26, 1993, to commence on Jan. 11, 1994. During the period Jan. 3 to Jan. 10, 1994, plaintiff moved to amend the caption, and defendant moved to reopen discovery and reschedule the trial. Both motions were denied during a pretrial conference on Jan. 10, 1994.

11. *City of Galveston*, 22 Cl.Ct. at 601–02.

12. Tex.Civ.Stat.Ann., art. 1187f (West 1993).

ers are public and governmental functions, exercised for a public purpose, and matters of public necessity.

Section 2 authorizes the government body of a city to issue bonds or other obligations payable from taxes or revenues or both. No election shall be required to authorize the issuance under the Act of bonds or other obligations payable solely from revenues if such bonds or other obligations do not constitute a debt of the city or a pledge of its faith and credit and if the owner or holder of any such bond or other obligation shall never have the right to demand payment out of any funds raised or to be raised by taxation.

Section 3(a) provides that during the period principal and interest on revenue bonds are unpaid:

... the management and control of such improvements and facilities (and the physical properties comprising the same) and of the income and revenue from them, including the authority to fix charges, prepare budgets, and authorize expenditures, by the terms of the ordinance authorizing the issuance of such bonds or other obligations may be may be placed in the hands of the governing body of the city or may be placed in the hands of a board of trustees to be named in such ordinance, consisting of not more than seven (7) members, one (1) of whom shall be a member of the governing body of such city; provided, if the city is operating under a Home Rule Charter and said Charter contains provisions requiring that the improvements and facilities be managed or controlled by a board of trustees, then the provisions of such Charter shall be followed.

For a city that operates under a home rule charter, administrative matters pertaining to organization and duties of a board of trustees (such as compensation, terms of office, powers and duties, election of successors) are controlled by the Charter provisions. If the Charter is silent, the laws and rules of the governing body of the city shall govern.

Section 3(b) provides:

If the management and control of the improvements and facilities is placed in the hands of a board of trustees by ordinance or Charter ... the board of trustees constitutes a body politic and corporate for the purpose of issuing bonds or other obligations and shall have and exercise, in addition to the powers enumerated in the ordinance or Charter, the following powers and authority:

Section 3(b) enumerates the powers and authority of the Board of Trustees in subsections (1) through (12). Subsections 2, 6, 10 and 11 provide:

(2) to employ a general manager and other officers, employees, and representatives as the board may consider appropriate and to fix their duties and compensation;

. . . . .

(6) to contract in its own name, but not in the name of the city....

. . . . .

(10) to sue and be sued in its own name; [and]

(11) to adopt, use, and alter a corporate seal....

Plaintiff cites these powers, specifically declared to be additional to those enumerated in the Charter, to support the contention that Galveston Wharves has sufficient independent authority to make it a legal entity separate from the City. The reporter's amendment references in Vernon's Texas Statute and Codes Annotated show Article 1187f has been amended numerous times since 1969. Section 1 was amended in 1969 and 1979. Section 2 was amended in 1979. Section 3 was amended in 1975 and Section 3(a) was added in 1979. Sections 1 to 11A were amended in 1983, and Section 3(b) was amended in 1987, 1989, and 1993.[13] The

---

**13.** Sec. 1 amended by Acts 1969, 61st Leg., 2nd C.S., p. 130, ch. 29, § 1, eff. Sept. 19, 1969; Sec. 2 amended by Acts 1973, 63rd Leg., p. 21, ch. 18, § 1, eff. Mar. 22, 1973; Sec. 3 amended by Acts 1975, 64th Leg., p. 874, ch. 332, § 1, eff. June 6, 1975; Acts 1977, 65th Leg., p. 149, ch. 73, § 1, eff. Apr. 25, 1977; Sec. 1 amended by Acts 1979, 66th Leg., p. 1904, ch. 772, § 1, eff. June 13, 1979; Sec. 2 amended by Acts 1979, 66th Leg., p. 478, ch. 219, § 1, eff. May 17, 1979; Sec. 3A added by Acts 1979, 66th Leg., p. 1905, ch. 772, § 2, eff. June 13, 1979; Secs. 1 to 11A amended

record does not show what powers, now in Section 3(b), were in effect in 1940. Nor does the record show when the powers listed in subsections 2, 6, 10, and 11 became effective.

During the course of plaintiff's applications in 1987 to the ICC and the RRB, and in litigation of its claims in this case, particularly during the 1989–93 period in pursuit of a disposition by summary judgment or by settlement, copies of the City Charter were presented in six different exhibits.[14] It is probable that defendant's copy of the Charter effective as of July 15, 1948, although in a different format, contains the same provisions in Article I as were in that Article after enactment of an ordinance on November 16, 1940, for acquisition of the entire property interest in GWC.[15]

In the 1948 Charter, Sections 1, 1–a, 1–b, and 1–c, embody some of the provisions subsequently contained in Article I of the later versions of the Charter. Article I apparently embodies a State statute enacted in 1903, and a city ordinance dated May 11, 1920. The best evidence of the provisions of those laws, of course, would be copies of the statute and ordinance themselves. The 1948 Charter contains the certification of the City Secre-

by Acts 1983; 68th Leg., p. 4886, ch. 867, § 1, eff. June 19, 1983. Sec. 3(b) amended by Acts 1987, 70th Leg., 2nd C.S., ch. 18, § 2, eff. Oct. 2, 1987; Sec. 3(b) amended by Acts 1989, 71st Leg., ch. 867, § 1, eff. June 14, 1989; Sec. 3(b) amended by Acts 1993, 73rd Leg., ch. 757, § 29, eff. Sept. 1, 1993.

**14.** Exhibit No. 1 to the affidavit dated July 12, 1988, of Doug J. Marchand, General Manager—Port Director, is a copy of Charter Article I, Incorporation, Form of Government, and General Powers, and Charter Article XII, Galveston Wharves, shows amendments through Apr. 11, 1963. The same copy of these Charter Articles was attached as Exhibit No. 1 to the unsigned and unagreed upon document entitled "First Stipulation of Facts" that was attached to plaintiff's amended requests to the IRS for refunds that were dated Feb. 16, 1990, and filed on or before Feb. 28, 1990. Plaintiff's trial exhibit No. 27 contains a copy of Charter Article XII, Galveston Wharves, which shows Section 4 was amended on Jan. 17, 1977, and Apr. 9, 1977, and that Section 9 was amended on Apr. 12, 1973. Defendant's Appendix to its posttrial brief contains a complete copy of the Charter, effective July 15, 1948; a complete copy of the City Charter, with amendments through 1969; and a copy of the complete Charter, effective Jan. 1, 1982. Article XII of the Charter, effective Jan. 1, 1982, shows the same amendments to Sections 4 and 9 as those shown in plaintiff's trial exhibit No. 27. All versions of the Charter, except the 1948 Charter, contained an Article XII, Galveston Wharves.

**15.** The 1948 Charter and Code was a revision and recodification of City ordinances that repealed all ordinances of a general and permanent nature except as specifically preserved. The ordinance that adopted the revised Code provided that the revision did not affect: any contract or right established or accruing before the effective date of the ordinance; any ordinance or resolution promising or guaranteeing the payment of money for the City or authorizing the issue of any bonds of said City or any evidence of said City's indebtedness; the administrative ordinances or resolutions of the Board of Commissioners not in conflict or inconsistent with the provisions of the Code. The Charter provisions in structural format apparently followed the law enacted in 1903 (Sp.Acts, 28th Leg. c. 37), and were presented separately in Part I (pages 1–124), with a separate index for Charter sections (§§ 1–141). There was no equivalent to Article XII in the 1948 Charter. The 1948 Charter § 19–h provided for a Harbor Master, who shall have the power to regulate and station all ships in the harbor, at wharves, or moored near thereto, to superintend and enforce all rules and ordinances regulating the docks, and to control the manner of loading and unloading vessels at the docks and wharves of the City. The City Board of Commissioners in § 46 were given the power:

to regulate and prescribe the mode and speed of vessels, steamboats and other crafts on entering and leaving the harbors of said city, and of coming to and departing from the wharves thereof, and the disposition of the sails, yards, anchors and other appurtenances of such vessels while entering, leaving or abiding in such harbor, and to regulate and prescribe the location of every steamboat, steamship or other craft, ship, vessel, barge, boat or float, and such changes of station and use of the harbor as may be necessary to promote order therein, and in the safety and equal convenience, as near as may be, or all steamboats, steamships, or other craft, ship, vessel, barge, boat or float, and may impose penalties for any offense against such ordinance, and may impose a harbor master to carry out the provisions herein granted and to report any violation of such regulation to the court having jurisdiction thereof.

The 1948 Charter § 71 concerned use of GWC dividends, § 102 concerned acquisition of property jointly owned by the City and GWC, and § 118 concerned partition of GWC property. Footnotes under those sections stated they were "now obsolete by reason of the city's acquiring by purchase the entire interest of [GWC] on November 16, 1940."

tary that it "is a true and correct copy of the CITY OF GALVESTON, TEXAS, CITY CHARTER, adopted by the Board of Commissioners of the City of Galveston, Texas, for period 1917 through 1948." The record is not clear, however, as to the language in the specific charter provisions that were in effect on November 30, 1940.

Plaintiff does not cite any judicial precedent establishing that the Board of Trustees of the Galveston Wharves is legally separate and distinct from the City with respect to the exercise of the powers conferred under Section 3(b) of Article 1187f and in the City Charter. The use of the term "separate utility" or "body politic" does not establish that the City is separated from or divested of its powers or of its obligations. There is judicial precedent that recognizes the City's continuing primary status. "Galveston Wharves" was defined as "a facility owned by the City of Galveston, Texas, and operated for it by the Board of Trustees," and, as the owner and operator of the extensive dock facilities of the Port of Galveston, it "has for some activities the status of a carrier by railroad under the Interstate Commerce Act." [16] The Board of Trustees of the Galveston Wharves does not have the power, under its authority to contract, to redelegate governmental functions of the City to a private party.[17]

Article XII of the Charter in Section 2 reserves to the City Council the power of appointment of all members of the Board of Trustees. Under this power, the City can maintain fundamental control over policies applicable to Port operations.

Section 5 provides that the Board of Trustees may contract "in the name of the Galveston Wharves for all essential purposes," but shall have no power to contract in the name of the City, and no contract by the Board "shall render the City liable for damages, indemnity or compensation or shall be binding other than on the properties, income and revenue of the Galveston Wharves." There is no documentation in the record that shows the details of any specific action on revenue bond authorization, issuance, or sale, during the period 1940–87.

Under Section 12, for the Board of Trustees to enter an employment contract that exceeds a 5–year term, it must obtain the consent of the City Council. Under Section 6, the Board of Trustees must keep its books of account and other records "as nearly as practicable according to the procedure prescribed by the [ICC] or other regulatory authority having jurisdiction," and must file annually an audited fiscal report with the City Secretary.

The trial exhibits of each party contained copies of reports to the Board of Trustees by its CPA auditors for years ending December 31, 1985, 1986, and 1987. The audit reports in defendant's exhibits are those that were included in the RRB administrative record as exhibits to the affidavit dated July 12, 1988, of Doug J. Marchand, General Manager— Port Director. Plaintiff's copies of the auditors' reports are contained in separate exhibits. There are differences in the two sets of the auditors' reports, particularly in the report for 1985.[18]

16. *United Indus. Workers of Seafarers Int'l Union v. Board of Trustees of the Galveston Wharves,* 351 F.2d 183, 184 (5th Cir.1965).

17. *City of Galveston, Texas v. Hill,* 519 S.W.2d 103, 105 (Tex.1975).

18. The auditors' reports were in defendant's trial exhibit No. 29, the administrative record of the RRB in plaintiff's appeals of L–88–5 and L–88–107. Defendant's trial exhibit No. 29 consists of a mixture of many different documents. It contains three methods of pagination: (1) a 'Bates number series applicable to the particular trial exhibit (Nos. 113–562), (2) a Bates number series in brackets that starts with L–85–119, dated Nov. 5, 1985 (Nos. [1]–[442] ), and (3) page numbers as in the original document. The 1985 audit

report was in trial exhibit No. 29, pages 259–292 and AR bracket numbers [137]–[173]; the 1986 audit report was in trial exhibit No. 29, pages 294–312 and AR bracket numbers [175]–[193]; the 1987 audit report was in trial exhibit No. 29, pages 315–335 and AR bracket numbers [196]–[216]. Plaintiff's exhibit No. 30, the 1985 audit report, consists of five unnumbered sheets and original document pages 2–14; plaintiff's exhibit No. 31, the 1986 audit report, consists of five unnumbered sheets and original document pages 2–15; plaintiff's exhibit No. 32, the 1987 audit report, consists of five unnumbered sheets and original document pages 2–16. Defendant's 1985 and 1986 audit reports did not contain the Asset page of the Balance Sheet. Defendant's 1985 audit report contains, as notes to the financial statements, 15 pages of supplementary infor-

Both sets of the auditors' reports for the years 1985–87 contained supplementary information which was needed for the Board of Trustees' annual report to the City. This supplementary information was the subject of an accountants' opinion that was separate from the accountants' opinion on the audited financial statements. The accountants' opinion on the supplementary information stated:

> The audited financial statements of the Board of Trustees of The Galveston Wharves are presented in the preceding section of this report. Supplementary information, contained in the following pages, is not considered essential for the fair presentation of the Wharves' financial position or the results of its operations. Our examination was made primarily for the purpose of formulating an opinion on the basic financial statements taken as a whole. However, the following data have been subjected to the audit procedures applied in the examination of the basic financial statements and are in our opinion, fairly stated in all material respects in relation to the basic financial statements taken as a whole.

The supplementary information provided a statement of net revenues as defined in the City's wharves and terminal bond ordinances, and a statement of operating revenues for the particular year. The information in these statements was required under Charter Article XII Section 6, Records, and Section 9, Payments to the City.

The Article XII Sections 6 in the 1969 Charter in defendant's appendix to its post-trial brief and in the Charters attached as exhibits to the July 12, 1988, affidavit of Doug J. Marchand and to plaintiff's document captioned "First Stipulation of Facts" were the same verbatim with the Article XII Section 6 in the 1982 Charter in defendant's appendix to its posttrial brief and in plaintiff's trial exhibit No. 27.[19] The language in Article XII Section 9 in defendant's 1969 Charter and in plaintiff's exhibits with the same Charter provisions, however, differed from the Article XII Section 9 in defendant's 1982 Charter and in plaintiff's trial exhibit No. 27.

Both versions of Section 9 provide for a payment to the City of $160,000 annually from the annual net income remaining after payment of all current maintenance and operating expenses. The 1969 Charter, however, included a proviso that had been deleted from the 1982 Charter pursuant to Ord. No. 73–17, April 12, 1973.[20] The deleted language was:

> Provided, that during the time the indenture of these properties, which was created

mation on trial exhibit pages 278–292 and AR bracket numbers [156]–[173]. The supplementary information includes: (1) for the period 1981 to 1985, three pages of statistical information captioned: Comparative Statement of Operating Revenues; Comparative Statement of Net Revenues; and Comparative Statement of Net Earnings; (2) for the period 1980 to 1985, five pages of statistical information captioned: Operating Revenues; Operating Expenses; Operating Income; Comparative Statement of Number of Employees, Gross Earnings, and Hours Worked; (3) for the period 1981 to 1985, three pages of statistical information captioned: Tonnage Handled Over Facilities; Inward–Outward–Internal Tonnage Handled Through Facilities; (4) Debt and Lease Service Schedule Payable from Net Revenues covering the period 1985 to 2006; (5) a table captioned: Galveston Wharves Facilities; (6) an Appendix A—History and Management of the Galveston Wharves; and (7) an Appendix B—narrative description of Wharves' facilities.

19. *See* fn. 14 *supra*.

20. Article XII, Section 9, in defendant's 1982 Charter and in plaintiff's trial exhibit No. 27 states:

> **Payments to the City.** From the annual net income remaining in each fiscal year after payment of all current maintenance and operating expenses the Galveston Wharves shall pay to the City of Galveston the sum of one hundred sixty thousand dollars ($160,000.00) of which amount twenty-five and thirty-nine one hundredths per cent (25.39%) shall be paid over the Galveston Independent School District and the remainder thereof shall be for general City purposes. All other net revenues of the Galveston Wharves shall be retained thereby for the betterment and extension of this utility to the benefit and advantage of the City, provided, this shall not prevent the Board of Trustees from agreeing and contracting to pay the City at a reasonable and proper rate for such special services furnished by the City to Galveston Wharves as would not customarily be furnished to other businesses or utilities or if so furnished would not be furnished without a charge being made therefor. (Ord. No. 73–17, § 3, 4–12–73).

by the Ordinance of October 17, 1940, shall remain in force and effect, the provisions for such payment, and for other disposition of the revenues of the Galveston Wharves, shall be as set out in such indenture.

The auditors' notes to the financial statements in the 1985 report stated that the Board of Trustees had followed the ICC accounting system until December 31, 1971. The auditors' notes stated:

The physical facilities of the Wharves were placed under the control of the Board of Trustees of the Galveston Wharves on November 30, 1940, at values established by the Interstate Commerce Commission. From November 30, 1940 through December 31, 1971, the Wharves followed the accounting system prescribed by the Interstate Commerce Commission.

The Wharves adopted a new chart of accounts on January 1, 1984. The balance sheet, the statement of income and retained earnings, and the statement of changes in financial position for the year 1983 have been re-aligned to conform to the newly adopted chart of accounts.

The auditors' notes also identified funds that were dedicated to revenue bond indentures issued by the City. The notes included the following comments:

Restricted Assets

The use of the reserve fund, operating reserve fund, and the interest and sinking fund and earnings from these funds is restricted to purposes outlined in the ordinances authorizing the issuance of City of Galveston, Texas, Wharves and Terminal Revenue Refunding Bonds, Series 1979, Series 1981, and Series 1983.

\* \* \* \* .\* \*

Long-term debt represents the unmatured balance of the City of Galveston, Texas, Wharves and Terminal Revenue Bonds, Series 1983, maturing annually from January 1, 1985 through January 1, 1988; Series 1981, maturing annually through January 1, 2006; City of Galveston, Texas, Wharves and Terminal Revenue Refunding Bonds, Series 1979, maturing annually in varying amounts through January 1, 2001; a bond payment contract with the City of Galveston maturing annually in various amounts through February 1, 1993; and special contract revenue bonds, Series 1977 and 1982, maturing annually through May 1, 2007.

The 1986 auditors' report in the notes to the financial statements contained comparable comments relative to restricted assets, revenue bonds issued by the City, and long term debt. The 1987 auditors' report in the notes to the financial statements, with respect to restricted assets stated:

Restricted Assets

The use of the reserve fund, operating reserve fund, and the interest and sinking fund and earnings from these funds are restricted to purposes outlined in the ordinances authorizing the issuance of City of Galveston, Texas, Wharves and Terminal Revenue Refunding Bonds, Series 1979, Series 1981, and Series 1983.

At December 31, 1987, the reserve fund and operating reserve fund were deficient in the amount of $824,806.

The auditors' notes to the financial statements in the 1987 report, with respect to long term debt, was comparable to the comments in the 1985 and 1986 reports.

The supplementary information that was provided in the auditors' reports pursuant to Charter Article XII Sections 6 and 9 shows net revenues as defined in the City's ordinances on Wharves and Terminal Revenue Bonds, for 1985, 1986, and 1987 as follows:

| | 1985 | 1986 | 1987 |
|---|---|---|---|
| Net operating income (loss) | ($1,984,226) | ($3,539,991) | ($491,285) |
| Net revenues as defined in ordinance | $816,521 | ($1,071,277) | $1,591,590 |

It is clear that, throughout the period 1940–87, revenue bonds applicable to acquisition, repair, replacement, and operation of port properties were obligations of the City. The record of this case does not contain as evidence any revenue bond indentures, copies of ordinances authorizing issuance of revenue bond indentures, or copies of ordinances authorizing amendments to Article XII Section 9.

The supplementary information in the auditors' reports for 1985, 1986, and 1987 included a statement captioned Operating Revenues which listed categories of services

available at the port and the dollar value of revenue attributed to each.[21] Both parties agree that switching and car repairs are railroad transportation services and that the RRTA and RURT apply to employees of the Board of Trustees who perform such services. Plaintiff contends that operating revenues from wharfage, dockage, loading and unloading, container terminal, equipment rental, stuffing/stripping, storage freight, shed hire, revenue services, berth rental, and miscellaneous are derived solely from published maritime tariffs or contracts filed with the FMC. As such, plaintiff argues, they are exclusively maritime revenues because they are regulated by the FMC. Plaintiff fails to distinguish the scope of jurisdiction of the FMC under the Shipping Act of 1984 to define port services which must be included in tariffs from the power to regulate the costs of such services. The costs for the services that marine terminal operators must include in their tariffs are those that are in agreements among marine terminal operators, and agreements between marine terminal operators and one or more ocean common carriers that involve ocean transportation in foreign commerce.[22] The statute is concerned only with common carriage by water; the tariff requirement does not apply to private carriage, contract carriage, and transport of bulk commodities. The FMC regulations in 46 C.F.R. §§ 515.1 to 515.91 apply to filing of tariffs by marine terminal operators engaged in carrying on the business of furnishing wharfage, dock, warehouse or other terminal facilities within the United States in connection with a common carrier by water in the foreign or domestic offshore commerce of the United States.[23]

The purpose of the regulations is to enable the FMC to discharge its responsibilities under the Shipping Act of 1916 and the Shipping Act of 1984 by keeping informed of practices, rates, and changes related to agreements that involve marine terminal operations and to keep the public informed of such practices.[24] Marine terminal operators who file tariffs with the ICC pursuant to statute or rule of that commission may satisfy the FMC tariff requirements by filing a copy of the ICC tariffs with the FMC.[25] FMC tariffs must be filed for operations in terminals "owned or operated by States and their political subdivisions," railroads who perform port terminal services "not covered by their line haul rates," "common carriers who perform port terminal services," and "warehousemen who operate port terminal facilities."[26] The regulation defines "port terminal facilities," "point of rest," and "terminal services" that must be included in the tariffs.[27]

Pursuant to regulations of the FMC, ICC, and the Railroad Commission of Texas (RCT), plaintiff filed the local tariffs of the Board of Trustees of the Galveston Wharves governing the handling of traffic over its railroad tracks with the FMC, the ICC, and the RCT.

Local Tariff No. GW 800, filed with all three administrative bodies, identified the participating members of the Mid–Gulf Seaports Marine Terminal Conference.[28] The tariff contained the following notice:

---

21. See Table p. 689–90 supra. The 1985 auditors' report included a table of annual operating revenues for the period 1981–85 as well as a table that showed the increase (decrease) from the previous year. The 1986 and 1987 reports showed only the increase (decrease) from the previous year.

22. 46 U.S.C.App. §§ 1703(b), 1702(15).

23. 46 C.F.R. § 515.1.

24. 46 C.F.R. § 515.2.

25. 46 C.F.R. § 515.5.

26. 46 C.F.R. § 515.3.

27. 46 C.F.R. § 515.6.

28. 1. Board of Commissioners of the Port of New Orleans
2. Board of Commissioners of Lake Charles Harbor & Terminal District
3. Greater Baton Rouge Port Commission
4. Orange County Navigation & Port District, Orange, Texas
5. Mississippi State Port Authority at Gulfport
6. Board of Commissioners of the Port of Beaumont, Navigation District of Jefferson County, Texas
7. Port Commission of the Port of Houston Authority of Harris County, Texas
8. Board of Trustees of the Galveston Wharves
9. Alabama State Docks Department—Port of Mobile

The Mid–Gulf Seaports Marine Terminal Conference agreement permits the participating members to discuss and agree upon port terminal rates, charges, rules and regulations. Any such rates, charges, rules, and regulations, adopted pursuant to said agreement, shall be published in the respective tariffs of said members and so identified by proper symbol and explanation.

This part of the tariff was in effect from July 31, 1977, to November 1, 1987.

Local Tariff No. GW 800, filed with the FMC and ICC, identified connecting lines to which certain tariffs applied:

Atchinson, Topeka & Santa Fe Railway Company (Santa Fe Lines)

Burlington Northern Railroad Company

Galveston, Houston & Henderson Railroad

Missouri–Kansas–Texas Railroad Company (Katy Lines)

Union Pacific System

Southern Pacific Transportation Company (Southern Pacific Lines).

The tariff contained the following notice:

(a) The charges and rules provided herein apply on Interstate and Foreign Traffic, except as otherwise provided, handled by the Galveston Wharves between points on its tracks, or received from, or delivered to its connections.

(b) Charges named in Item No. 115: Apply on all cars handled regardless of tonnage, and cover the movement of loaded car one way and return of the empty, or the placing of empty cars and their return under load. If loaded in both directions regular charges will apply on each movement.

This part of the tariff was effective from April 6, 1987, to November 1, 1987. It superseded a similar part that had been effective since April 1, 1983.

The requirement to file tariffs with the FMC does not determine that the operating revenues, obtained by providing the category of services as defined in 46 C.F.R. § 515, are regulated exclusively by the FMC or subject to the exclusive jurisdiction of the FMC. Plaintiff's General Manager—Port Director testified that from 1970 to the present the FMC has not regulated any rates or charges under Federal Maritime tariffs. The rates or charges for services were determined by the participating members of the marine terminal conference.

Whether a charge for the category of services plaintiff claims are services solely provided by a marine terminal operator is regulated by the FMC, the ICC, by both or by neither, depends on many facts. First, the revenue must be revenue from common carriage.[29] Other considerations include the circumstance that contracts in private charter water carriage are exempted from tariff requirements, as are bulk carriage and operations of facilities through leases.[30]

Who is an "employer" under I.R.C. § 3231(a) for purposes of the RRTA depends on such nuances as whether a person "under common control" is a corporate entity.[31] In this regard it is significant that plaintiff is a home rule city and the Board of Trustees operations are as a public utility or a subset of the City.

A carrier may be subject to regulation by the FMC in some respects and in other respects by the ICC.[32] To reduce confusion in determining whether the ICC or FMC have jurisdiction over specific movements, the commissions issued a joint policy statement on December 5, 1991, on their respective jurisdictions over trucking services. The joint policy statement notes:

Under the Shipping Act, 1916, and the Intercoastal Shipping Act, 1933, the FMC regulates the rates and practices of ocean carriers providing all-water service be-

---

**29.** *See Carrier Status of Containerships, Inc.,* 6 S.R.R. 483 (FMC No. 1216, Sept. 28, 1965); *Port of Tacoma v. S.S. Duval,* 364 F.2d 615 (9th Cir.1966).

**30.** *See Association of P & C Dock Longshoremen v. The Pittsburgh & Conneaut Dock Co.,* 8 I.C.C.2d 280 (1992).

**31.** *See Union Pacific Corp. v. United States,* 5 F.3d 523 (Fed.Cir.1993).

**32.** *Baltimore & O.R. Co. v. United States,* 201 F.2d 795, 797 (3rd Cir.1953).

tween mainland ports and domestic offshore ports. Under the Interstate Commerce Act, the ICC regulates joint-rate, through-route transportation provided by ocean carriers in conjunction with trucking companies or railroads between mainland points and domestic offshore ports. The jurisdiction of each agency is exclusive: the FMC may not regulate joint through services and the ICC may not regulate all-water services.

This policy statement was prompted by a series of complaints by shippers and freight-consolidators that certain transportation services covered by tariffs filed with the ICC were in fact subject to FMC jurisdiction. These disputes focused on motor/water services where the motor movement was confined to the ocean carrier's waterside port terminal. The cargo was picked up or delivered by the shipper at the terminal gate, and the motor carrier moved the cargo only between the terminal gate and the ocean vessel. The motor carrier did not provide any transportation of the cargo over public roads to inland points. The ICC and FMC agreed that "inside-the-terminal-fence" motor movements would be regarded as part of ordinary all-water movements, and domestic offshore carriers offering all water services would file tariffs covering such services only with the FMC. By contrast, the policy statement presumed that motor carrier operations outside the terminal fence, unless performed on behalf of the ocean carrier as part of a pickup and delivery service included in the carrier's tariff, are trucking services that can be a component of a joint rate. Ocean carriers should therefore assume that such services, if held out as part of a joint-rate through route, are subject to ICC jurisdiction and should file the tariffs for such services with the ICC.

Many of the services that plaintiff identified as sources of operating revenues within the exclusive jurisdiction of the FMC have been recognized as services compensable as part of railroad transportation, therefore subject to the RRTA. Loading and unloading and storing sugar is a transportation service within the meaning of the Interstate Commerce Act (ICA). Its cost could be included in line-haul tariffs, or separately fixed and allowed as an additional charge.[33] Maintenance and care of an office building essential to the operation of a railroad, performed by a wholly owned subsidiary, was part of the transportation services.[34] A wholly owned subsidiary that manufactured concrete crossties and provided 90 percent of its production to its parent railroad, which also maintained the accounting and personnel records and handled the insurance claims of the subsidiary, provided a service in connection with railroad transportation.[35] Longshoremen transferring phosphate from railroad boxcars and storage tanks onto ships were employees, and the employer was subject to the RRTA, because the carrier could have performed the work and charged for it.[36] A company which started a new business rebuilding locomotives and other rolling stock provided service in connection with rail transportation because its principal investor was the controlling shareholder of a company that offered rail service. It was found to be under common control with the railroad and a statutory "employer".[37]

On the basis of precedent, in addition to switching and freight car repairs, the categories of services listed as sources of plaintiff's operating revenues—loading and unloading (LUL), storage, shed hire, and rentals—are services in connection with transportation of property by railroad. Plaintiff has produced no evidence that provides a basis for allocating a part of its operating revenues in these

**33.** *Railroad Retirement Bd. v. Duquesne Warehouse Co.,* 326 U.S. 446, 453, 66 S.Ct. 238, 241, 90 L.Ed. 192 (1946).

**34.** *Southern Development Co. v. Railroad Retirement Bd.,* 243 F.2d 351, 355 (8th Cir.1957).

**35.** *Railroad Concrete Crosstie Corp. v. Railroad Retirement Bd.,* 709 F.2d 1404, 1408 (11th Cir. 1983).

**36.** *Atlantic Land & Improvement Co. v. United States,* 790 F.2d 853, 856 (11th Cir.1986).

**37.** *Livingston Rebuild Center, Inc. v. Railroad Retirement Bd.,* 970 F.2d 295, 296 (7th Cir.1992).

categories solely to the provision of marine terminal services.

Operating revenues from switching and freight car repairs were a total of $3,339,579 in 1985, a total of $2,697,199 in 1986, and a total of $4,976,143 in 1987. Revenues from switching and car repairs amounted to 25.6 percent of total operating revenues in 1985, 23.3 percent in 1986, and 42.7 percent in 1987.

Operating revenues from LUL, storage, shed hire, and rentals were a total of $3,458,-316 in 1985, a total of $2,749,231 in 1986, and a total of $1,774,052 in 1987. Operating revenues from switching, car repairs, LUL, storage, shed hire, and rentals were a total of $6,797,895 in 1985, a total of $5,446,430 in 1986, and a total of $6,750,195 in 1987. Operating revenues from all services in connection with rail transportation, including switching, car repairs, LUL, storage, shed hire, and rentals amounted to 52.1 percent of total operating revenues in 1985, 47.1 percent in 1986, and 58.0 percent in 1987. Accordingly, during the period 1985 to 1987, Galveston Wharves derived over 50 percent of its operating revenues from services in connection with transportation of property by railroad.

The Port of Galveston facilities were managed by a general manager—port director and four deputy port directors. Each deputy port director managed one of four departments: Facilities Management, Operations, Port Development, and Finance and Administration. During the years in issue, Galveston Wharves' payroll records had two payroll classes: regular and railroad. The regular payroll included employees in Facilities Management, Port–Development, Finance and Administration and some of the employees in Operations. The railroad payroll employees were in the Operations Department. Operating revenues generally were the product of personnel in the Operations Department. There are two groups of employees on the regular payroll that also performed railroad functions: personnel in Finance and Administration and personnel in Operations that produced operating revenues from LUL, storage, shed hire, and rentals.

■ Personnel in Finance and Administration performed administrative support functions to railroad operations. The Finance and Administrative Department collected and maintained payroll records and time sheets kept by railroad clerks, prepared checks, billings and collections, prepared the CT–1 forms for RRB reports, and was the purchasing agent for all rail and other purchases. The Finance and Administrative Department performed functions directly related to railroad activities in addition to the functions related to other port activities. There is no provision in the RRA or RUIA to apportion wages of one employee between covered programs and noncovered programs.[38]

Accordingly, personnel in Finance and Administration and personnel in Operations providing LUL, storage, shed hire, and rentals, should be deleted from the regular payroll and added to the railroad payroll. Employees on Galveston Wharves payroll directly engaged in transportation of property by railroad numbered 268 in 1985, 334 in 1986, and 152 in 1987. This was 70.3 percent of the 381 total employees in 1985, 75.5 percent of the 429 total employees in 1986, and 65.2 percent of the 233 total employees in 1987.

PAYROLL RECORDS *

| | 1985 | 1986 | 1987 |
|---|---|---|---|
| RAILROAD PAYROLL | 84 | 86 | 69 |
| REGULAR PAYROLL: | | | |
| Fin. & Admin. | 28 | 22 | 23 |
| LUL | 156 | 216 | 60 |
| TOTAL | 268 | 324 | 152 |

* Plaintiff's exhibit No. 102.

In its claim for a refund of RRTA and RURT taxes, plaintiff contends that its port facility operations should be segregated from its rail carrier business. The Treasury Regulations applicable to the RRTA and the RURT do not deal specifically with segregation of carrier business from noncarrier business. The IRS, however, has applied the RRB's segregation standards applicable to

---

**38.** *Standard Office Bldg. Corp. v. United States,* 819 F.2d 1371, 1377 (7th Cir.1987).

railroad affiliates principally engaged in some other business.[39] Redesignation of Galveston Wharves status as an employer so as to segregate its rail carrier operations from its nonrail operations involves application of the RRB standards applicable to companies or persons principally engaged in noncarrier operations, but in addition engaged in some carrier business.[40] Although the matters to be considered by the RRB in reaching a determination under the applicable regulations differ, it is reasonable to conclude that the IRS would apply the RRB standards developed in both regulations. The IRS recognizes that the term "employer" is identically defined in the RRTA and in the companion statutes RRA and RUIA. The IRS has endorsed the policy of construing and applying the term "employer" in the RRTA in the same manner as that term is construed and applied in the RRA and RUIA.[41]

An activity is a railroad service or activity "in connection with the transportation of passengers or property by railroad,• or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage or handling of property transported by railroad" if the service or activity is reasonably directly related,

functionally or economically, to the performance of obligations undertaken as a common carrier by railroad or to the handling of property transported by railroad.[42] The segregation rule "contemplates that either the company in its entirety or some identifiable and separable enterprise conducted by it shall be brought within the comprehension of the Act."[43] The words of the statute " 'performs any service ... in connection with [rail] transportation' were intended to exclude services unrelated to rail transportation, such as operating an amusement park open to the public on land owned by the railroad, rather than to make a hair-splitting distinction between workers who 'really' run the railroad and those who back up the former group."[44]

In order to determine whether a company or person principally engaged in business other than carrier business can segregate its carrier business, the RRB requires submission of information "pertaining to the history and all operations of such company or person" to determine whether a separable enterprise is to be considered the "employer." Matters to be considered are identified in the regulation.[45] In a situation where the "em-

---

**39.** 20 C.F.R. § 202.9—Controlled company or person not principally engaged in service or operation in connection with railroad transportation.

**40.** 20 C.F.R. § 202.3.

**41.** Rev.Rul. 77–445, 1977–2 C.B. 357; Gen. Couns.Mem. 38078 (Sept. 5, 1979).

**42.** 20 C.F.R. § 202.7 provides:

Service or operation in connection with railroad transportation.

The service rendered or the operation of equipment or facilities by persons or companies owned or controlled by or under common control with a carrier is in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, if such service or operation is reasonably directly related, functionally or economically, to the performance of obligations which a company or person or companies or persons have undertaken as a common carrier by railroad, or to the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad.

**43.** *Adams v. Railroad Retirement Bd.,* 214 F.2d 534, 541 (9th Cir.1954).

**44.** *Standard Office Bldg.,* 819 F.2d at 1376.

**45.** 20 C.F.R. § 202.3(a) provides:

(a) With respect to any company or person principally engaged in business other than carrier business, but which, in addition to such principal business engages in some carrier business, the Board will require submission of information pertaining to the history and all operations of such company or person with a view to determining whether some identifiable and separable enterprise conducted by the person or company is to be considered to be the employer. The determination will be made in the light of considerations such as the following:

(1) The primary purpose of the company or person on and since the date it was established;

(2) The functional dominance or subservience of its carrier business in relation to its non-carrier business;

(3) The amount of its carrier business and the ratio of such business to its entire business;

(4) Whether its carrier business is a separate and distinct enterprise.

ployer" is found to be an aggregate of legal entities, or a part of a legal entity, or a person that operates in only one of several capacities, the unit or units competent to assume legal obligations is responsible for discharge of the "employer" duties.[46]

The preceding parts of this opinion and the prior February 21, 1991, opinion, present the information in the record that relates to the four matters to be considered under Section 202.3(a). At this point, it is sufficient to highlight the basis for the ultimate conclusion regarding each matter.

### (1) The primary purpose of the company or person on and since the date it was established.

The City of Galveston acquired the real estate and facilities that comprise the Port of Galveston through a purchase on November 30, 1940, that was paid for principally by the issuance of City of Galveston Wharf and Terminal Facilities Revenue Bonds, some of which were payable in installments to August 1, 1990. The revenue bonds were payable as to principal and interest solely from revenues of the properties acquired and were secured by a mortgage on these properties. The City wanted to acquire GWC to gain ownership of waterfront properties and to operate those properties so as to compete with other municipally owned port facilities in the Gulf of Mexico. When the City applied to the ICC for approval of the acquisition, it requested permission to issue bonds "to acquire and operate the line of railroad and other properties of the Galveston Wharf Company."

In 1940, when it acquired the real estate and port facilities from GWC, the City understood and intended that it and its personnel engaged in port operations would be subject to ICC regulations. From November 30, 1940, to November 4, 1987, the City issued revenue bonds and the Board of Trustees operated the real estate and facilities of the Port of Galveston in compliance with ICC regulations.

In 1940, and in the 1985–86 tax period, the rail facilities were central to the activities at the port, and the Port of Galveston could not exist as a factor in ocean commerce if the railroad properties were not operative. Between 75 percent to 80 percent of all domestic outbound traffic arrived at the port by railroad carriage; between 75 percent and 80 percent of all inbound foreign traffic left the port by railroad carriage.

### (2) The functional dominance or subservience of its carrier business in relation to its non-carrier business.

In its June 2, 1941, segregation letter L–41–263, the RRB determined the Board of Trustees and its operating personnel was an identifiable unit of the City that had been an employer within the meaning of the RRA and the RUIA since December 1, 1940. At that time, personnel active at the port included a harbor master and such employees as were needed to handle ocean carriers at the piers, docks, and other port facilities. During the entire period November 30, 1940, to November 4, 1987, the Board of Trustees operated the Port of Galveston as an integrated unit to service mutually dependent ocean common carriers and common carriers by railroad.

### (3) The amount of its carrier business and the ratio of such business to its entire business.

Information in the record does not provide the tonnage of total freight traffic, domestic or foreign, handled by the Board of Trustees of the Galveston Wharves during the years in issue. Information as to the character of commodities handled is incomplete. The record also does not establish the breakdown of traffic allocable to truck transportation during the period 1940–87.

Plaintiff has provided no basis for allocating a part of its operating revenues to the provision of marine terminal services with respect to loading and unloading, storage, shed hire and rentals. During the period

---

**46.** 20 C.F.R. § 202.3(b) provides:

(b) In the event that the employer is found to be an aggregate of persons or legal entities or less than the whole of a legal entity or a person operating in only one of several capacities, then the unit or units competent to assume legal obligations shall be responsible for the discharge of the duties of the employer.

1985 to 1987, the Board of Trustees of the Galveston Wharves derived over 50 percent of its operating revenues from services in connection with the transportation of property by railroad.

The Board of Trustees of the Galveston Wharves' total payroll in 1985 numbered 381 employees. In 1986, the number of employees was 429, and in 1987, it was 233. In 1985, employees on the payroll who were directly engaged in the transportation of property by railroad comprised 70.3 percent of the total employees. In 1986, the percentage was 75.5 percent and in 1987, it was 65.2 percent.

### (4) Whether its carrier business is a separate and distinct enterprise.

Operation of the Port of Galveston by the City through the Board of Trustees of the Galveston Wharves was a unitary operation which coordinated on a daily basis operation of railroad activities with maritime freight commerce. Such coordination was necessary to move cargo from rail to ship and from ship to rail. In the absence of the railroad transportation facilities provided by the Class III switching and terminal railroad and the services required to support handling of domestically originated outbound freight cargo, there would be no reason for shippers and other railroads to use the port. Conversely, in the absence of the railroad transportation facilities and related services, ocean common carriers would not call at the port. This is not a case similar to a railroad owning an amusement part, or a computer company that owns a separate and distinct railroad. In this case there is one complex of plant and facilities comprised of mingled and overlapping modes of transportation with the single goal of promoting business through the port.

Since 1940, the City and the Board of Trustees have combined and fused transportation by railroad carrier with transportation by ocean carrier. On the facts in this record, there is no basis on which to find that the railroad carrier business was a separate and distinct operation during the period January 1, 1985, to November 4, 1987.

■ Plaintiff contends defendant has discriminated against Galveston Wharves by failing to fairly and uniformly administer the tax statutes so as not to discriminate between taxpayers similarly situated. Plaintiff supports the contention that the United States knowingly discriminated since 1968 by reference to the November 23, 1966, internal memorandum on Railroad Separation, and the February 29 and March 20, 1968, letters to the RRB General Counsel.[47] Plaintiff now states that the reason the RRB General Counsel chose to ignore Galveston Wharves request was because the RRB had not always been consistent about related dock activities at various places, and cites an exhibit of a recorded telephone conversation on September 19, 1968, between a Justice Department attorney, who was working on a Railway Labor Act election case that involved the Terminal Railway Alabama State Docks Commission, and the RRB General Counsel regarding coverage under the RRTA.[48] For

47. *See City of Galveston,* 22 Cl.Ct. at 614.

48. This exhibit was admitted in evidence after an initial ruling to exclude was reconsidered, and the following colloquy occurred:

THE COURT: When did you find out about the importance of this document?

MR. McKENNA: Well, this document was shown to me in November of 1989, but a copy of it was not given to me until November or October of 1993. So, I've known of the document's existence, but I did not have access to the document for almost four years after they showed it to me when I visited their offices.

THE COURT: In that four years, how many times have we had cut off dates for discovery, and then we've opened them up and gone ahead and allowed more discovery? Many,

many times. Most of the time, or much of the time in this case has been spent with discovery on the sidelines and negotiation for settlement.

MR. McKENNA: Yes, Your Honor.

THE COURT: At this stage, I am reluctant to restrict the record on the basis of failure to comply with procedural rulings or discovery rulings. But, the value of this document as an admission or as showing that the IRS or the Railroad Retirement Board essentially was equivocal in the way it handled segregation requests.

It would go to your contention as far as what the administrative practice has been and so on. I'm going to reverse my decision of this morning. I'm going to admit Plaintiff's Exhibits 77 through 79 for the purpose of showing that these are the conversations that took place in

whatever reason, Galveston Wharves did not persist in its 1968 effort, and no ruling was made by the RRB General Counsel on the basis of information provided at that time.

Plaintiff further supports the discrimination argument with the assertion that the defendant learned through a nationwide investigation that there were two organizations operating in a manner similar to Galveston Wharves' operations during the period 1985–87.[49] From this "evidence" plaintiff argues:

> In light of the half-century of consistent public rulings which were recently affirmed and the evidence of deliberate and knowing discrimination, this Court does not need a legal compass to navigate through this issue. The IRS is not saying, "We made a mistake and want to correct it." The IRS is saying, "We have the power to play favorites with the tax code." Any decision in this case which would empower the bureaucrats to indiscriminately favor one taxpayer and punish another would seriously undermine our voluntary tax system and would be an error.

Plaintiff has filed as exhibits a series of RRB letter rulings that involve other port authorities.[50] The issue in this case is whether the segregation policy and law can be applied to the relationship where the City participates in operations at the port in conjunction with the Board of Trustees' operations of the port. The numerous port authorities and railroad operations that are the subject of the various letter rulings are not involved in this case, and presumably each has as complicated a foundation and background of related issues, such as funding, state law, municipal ordinances, and actual operations, as those issues examined in this case for Galveston Wharves. As this case exemplifies, comments in letter rulings may not be clear or final as to some issues. The letter rulings that plaintiff references are not an adequate showing to establish that the United States has discriminated against Galveston Wharves in the manner plaintiff argues. The evidence in this case, including the letter rulings of the RRB and IRS, does not establish that Galveston Wharves in 1985–87 "was the only location where related docks activities were covered by railroad retirement."

■■■ The record of administrative practice is relevant as a matter of substantive law.[51] RRB letter rulings, private IRS rulings, and IRS general counsel memoranda, however, are not binding precedent.[52] The mere fact that another taxpayer has been treated differently from the plaintiff does not establish the plaintiff's entitlement.[53] The fact that all taxpayers or all areas of the tax law cannot be dealt with by the Internal Revenue Service with equal vigor and that there thus may be some taxpayers who avoid paying the tax cannot serve to release all

the consideration of the Alabama State Docks matter. That is not an indication that the Alabama State Docks matter is the same as the Galveston matter. That's not, certainly a determination as to the question of whether the United States, in this case, has made an admission that there has been discrimination on the discrimination issue.

**49.** This argument is based on an affidavit dated Oct. 25, 1988, of the Director of Research for the American Association of Port Authorities, that was attached to Galveston Wharves' supplemental brief on July 20, 1988, to the RRB in the appeal of L–88–5. It is in the record as part of defendant's exhibit that incorporated the RRB administrative record. Defendant's trial exhibit No. 29, p. 533, AR [413].

**50.** South Carolina State Ports Authority (L–51–73, L–56–562); Johnson County [Kansas] Airport Commission (L–89–32); Terminal Railway Alabama State Docks Commission (L–39–106, L–41–388, L–92–21); North Carolina State Ports Authority (L–80–51); Savannah State Docks Railroad Company, Georgia Ports Authority (L–53–16, L–53–86); Municipal Docks Railway, City of Jacksonville, Florida (L–51–275), State Belt Railroad, San Francisco Board of State Harbor Commissioners (L–37–944); Broward County Ports Authority (L–48–228).

**51.** *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Horner v. Andrzejewski,* 811 F.2d 571, 574 (Fed.Cir.1987).

**52.** *Rowan Companies, Inc. v. United States,* 452 U.S. 247, 261 n. 17, 101 S.Ct. 2288, 2296 n. 17, 68 L.Ed.2d 814 (1981).

**53.** *Diebold v. United States,* 16 Cl.Ct. 193, 213 & n. 22, *aff'd,* 891 F.2d 1579 (Fed.Cir.1989), *cert. denied,* 498 U.S. 823, 111 S.Ct. 73, 112 L.Ed.2d 47 (1990).

other taxpayers from the obligation.[54] The Commissioner's failure to assess deficiencies against some taxpayers who owe additional tax does not preclude the Commissioner from assessing deficiencies against other taxpayers who admittedly owe additional taxes on the same type of income.[55] A taxpayer cannot premise its right to an exemption by showing that others have been treated more generously, leniently or even erroneously by the IRS. The fact that there may be some taxpayers who have avoided paying a tax does not relieve other similarly situated taxpayers from paying their taxes.[56]

Inasmuch as plaintiff has not established entitlement to a refund of RRTA and RURT taxes, defendant's alternative claim for a set-off of payroll taxes that would be owed for the tax years 1985–87 under the Federal Insurance Contributions Act (FICA)[57] need not be addressed. No ruling is made on the setoff issue, nor on the status of the agreement with the State of Texas under Section 218 of the Social Security Act.[58]

### III

■ On July 26, 1993, plaintiff moved to strike pages 6–10, and pages 21–23 of defendant's July 27, 1990, cross-motion for summary judgment, and pages 1–2 of defendant's September 17, 1990, reply brief in support of its cross-motion for summary judgment. The motion to strike was based on the argument that defendant had failed to comply with the requirement of RCFC 11 that the legal arguments be warranted by existing law to the best of the parties' knowledge, information and belief after reasonable inquiry. As a sanction, plaintiff sought all costs of the appeal, including attorney fees.

Plaintiff's motion and defendant's August 11, 1993, response, were discussed during an August 12, 1993, telephone conference that reviewed the status of settlement negotiations, six pending motions, and a schedule to complete discovery on the issues to be resolved pursuant to the October 28, 1991, remand from the Federal Circuit. The August 12, 1993, order deferred, until all other issues have been determined, disposition of plaintiff's July 26, 1993, motion to strike and to impose RCFC 11 sanctions.

On August 8, 1994, plaintiff filed a motion to strike pages 138–320 of Appendix A to defendant's July 22, 1994, posttrial brief. The pages to be stricken include the 1969 Galveston City Charter, the 1948 Galveston City Charter, and the 1982 Galveston City Charter.[59] The motion asserts the subject pages were additional evidence in violation of the January 24, 1994, order closing proof, did not include anything new and relevant to the issues, and were "incomplete and misleading because it did not include, inter alia, the October 17, 1940, Ordinance or the original contract of encumbrance which established Galveston Wharves." The motion states that defendant's contact with the Secretary to the City Council in order to obtain a certification dated May 13, 1994, as to copies of the city records without the knowledge and consent of plaintiff's counsel was improper and prejudicial to plaintiff. In paragraph 7 of the motion plaintiff stated that it believes consideration of the July 26, 1993, RCFC 11 motion would now be timely.

The pages plaintiff seeks to strike from defendant's July 27, 1990, cross-motion for summary judgment contain the following topics:

Summary of Argument—This describes defendant's primary argument and two arguments in the alternative: if it were assumed there could be two classes of employees (1) failure of proof, and (2) waiver of right to offer proof.

Argument I—Plaintiff's motion for summary judgment should be denied and defendant's motion for summary judgment should be granted because defen-

---

**54.** *Wagner v. United States,* 387 F.2d 966, 972, 181 Ct.Cl. 807 (1967).

**55.** *Kehaya v. United States,* 355 F.2d 639, 641, 174 Ct.Cl. 74 (1966).

**56.** *Easter House v. United States,* 12 Cl.Ct. 476, 490 (1987).

**57.** 26 U.S.C. §§ 3101–3127.

**58.** 42 U.S.C. § 418.

**59.** *See* footnotes 14 & 15 *supra.*

dant has established as a matter of law that during the periods in issue plaintiff was a carrier that did not qualify for relief under the "segregation" rules.

Argument III *—Having failed for 46 Years to seek "segregation" to add to that approved by the RRB in 1941, the City of Galveston is not entitled to retroactive "resegregation" to the injury of its employees or the public fisc.

*(Alternative 2)

The pages plaintiff seeks to strike from defendant's September 18, 1990, reply brief include:

1. In the first argument in its "Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment" at 4–7 (pltf. reply br.), plaintiff rebuts an argument that defendant never made. Plaintiff erroneously asserts (at 6) that: "the United States now rejects the principle of segregation in its entirety." To the contrary, defendant has asserted and continues to assert that the principle of and the procedures for "segregation" are provided by regulations issued and administered by the Railroad Retirement Board (RRB). See defendant's brief in support of its cross motion for summary judgment (def. br.) at 11–12. Defendant contends that in litigation plaintiff cannot avail itself of "segregation" because, among other reasons, plaintiff chose not to utilize the administrative procedures provided by those regulations.

In its August 11, 1993, response to the motion to strike, defendant highlighted statements made in its argument that were challenged by plaintiff, and showed that sanctions under RCFC 11 are not appropriate because each argument presented by defendant to this Court in its briefs was well grounded in fact and was warranted by existing law. Defendant noted that the Federal Circuit did not specifically reject the applicability of the equitable arguments made before this court and on appeal. Defendant pointed out: "The Federal Circuit's reversal and remand hardly establishes that the defendant's arguments that called for the same result reached by this Court were not legally 'warranted' for purposes of Rule 11."

 RCFC 11 requires every pleading, motion, or other paper to be signed by the attorney of record. The rule also provides that the signature of an attorney or party constitutes a certificate that (1) the attorney has read the pleading, motion, or other paper, (2) to the best of the attorney's knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law, and (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needlessly increase costs. In the event a pleading, motion, or other paper is signed in violation of the rule, the court, on motion or on its own initiative, "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction." The sanction may include an order to pay the expenses reasonably incurred because of the filing, and such expenses may include reasonable attorney fees.

RCFC 11 is patterned on Rule 11 of the Federal Rules of Civil Procedure (FRCP). Amendment of FRCP 11 in 1983 expanded significantly the responsibility imposed on attorneys when signing pleadings or motions.[60] The pre–1983 rule required a showing of bad faith before imposition of any sanctions would be permitted. This bad faith requirement was eliminated. The 1983 amendment imposed an affirmative prefiling obligation on counsel to inquire as to the applicable facts and law.

Application of RCFC 11 to the conduct of counsel in this case involves consideration of the complexity of the legal issues, changes in railroad and shipping regulatory statutes between 1940 and 1987, and the course of litigation on plaintiff's refund claim at the time plaintiff's motions to strike were made. In the relevant years, there was no defined body of case law on the application of 20 C.F.R. § 202.3 in a segregation case as to any carrier. Application of Section 202.3 in the context of a municipality which had had a prior segregation ruling under Section 202.3 was unique.

---

**60.** *Coburn Optical Indus., Inc. v. Cilco, Inc.,* 610 F.Supp. 656, 658 (M.D.N.C.1985).

The railroad retirement statutes are complex and highly integrated. This case is complex factually and procedurally. Its history has been protracted by a succession of different concepts. From September 22, 1989, to August 12, 1993, the case proceeded on the assumption that the segregation and the offset issues could be resolved through summary judgment procedures. Discovery and settlement negotiations were in this framework. In November 1991, the parties started active negotiations for settlement that were focused on information that had been discovered prior to the start of negotiations. In addition to counsel for the parties, these negotiations included, at various times, representatives of the IRS, the RRB, the Social Security Administration, the Attorney General of the State of Texas and the Texas Employee Retirement System.

All aspects of the segregation and offset issues have been fought with vigor and imagination by counsel highly skilled in tax practice. Disposition through summary judgment procedures was abandoned on August 12, 1993, because counsel were unable to agree upon matters that normally would have been stipulated as a matter of routine when the facts related even indirectly to aspects of segregation or offset. After August 12, 1993, discovery efforts focused on the particulars of segregation and offset, and continued through the pretrial conference on January 10, 1994. On January 11, 1994, the first trial day, counsel submitted a skeletal stipulation of facts that contained 11 paragraphs. At that time, counsel were unable to even agree upon the name of the party plaintiff.[61]

Counsels' efforts to secure an advantage in position on segregation and offset issues resulted in a proliferation of procedural motions. These included motions in limine, for a protective order, to reopen discovery, to postpone trial start, to amend the pleadings, in addition to the motions to strike. In the motion papers intensity of argument increased. Legal argument and analysis by counsel increasingly was innovative, artfully contrived, and facile, and presentation technique became dramatic and florid.[62] The motions to strike and the requests for sanctions are consistent with the program followed by each to assert any procedural argument that could lead to a tactical advantage.

During pretrial preparation and at the pretrial conference on January 10, 1994, counsel were cautioned about the preparation and indexing of exhibits to be offered in evidence. Each exhibit was to be a single document, separately numbered, with a descriptive index that identified the document and the number of pages. During the long period of attempts to dispose of the claim through summary judgment procedures and through a negotiated settlement, however, counsel had identified factual matters by reference to documents attached to affidavits, declarations, or incorporated in proposed stipulations. At the beginning of trial, counsel did not object to exhibits that were so organized, and such exhibits were included in exhibits admitted en masse. As a result, exhibits of both parties do not comply with pretrial instructions.

Defendant's exhibit No. 29 consists of a copy of the 2–page majority opinion and the 4–page dissenting opinion of the February 22, 1989, RRB order 89–74, as well as the entire administrative record in the appeals of L–88–5 and L–88–107. Defendant's trial exhibit, through this technique was a 448–page compilation of numerous and sometimes contradicting documents. Defendant's exhibit included an affidavit of Doug J. Marchand, General Manager—Port Director, that at-

---

61. In posttrial briefing plaintiff requested findings of fact numbered 1–260. Of these, defendant made no objection to 45 findings and its objection to 45 additional findings were based on distinction in its concept of the City, the Board of Trustees, and the identity of a railroad operation. Defendant requested findings of fact numbered 1–58. Plaintiff made no objection to 17 findings and its objection to 10 additional findings were based on the nomenclature used to identify plaintiff.

62. The July 26, 1993, motion to strike contends defendant shows "a reckless indifference to the views of agency counsel"; the United States used "the statutory complexity to mislead the court through its contradictory, confusing and convoluted arguments"; defendant's actions are "indicative of a pattern of abusive litigation when the United States levels arguments and allegations with little or no regard for its affirmative duty to conduct a reasonable inquiry."

tached as exhibits No. 1 through No. 9, in support of facts asserted in the affidavit, including elaborate statistical presentations of plaintiff's version of asset and revenue data.[63]

Defendant's trial exhibit No. 16 is a deposition of Mr. Marchand taken August 19, 1993, that also included attached documentary exhibits. Mr. Marchand also was plaintiff's principal witness at trial. His testimony required 4 trial days and 359 pages of trial transcript.

Plaintiff's trial exhibit No. 18 is a document captioned First Stipulation of Facts that is unsigned and not agreed to. This document was attached to each of plaintiff's three IRS Form 843 claims for refunds, for the relevant tax years, signed on February 16, 1990, and received February 20, 1990. Extracts from Form 843 also were separate plaintiff trial exhibits. The First Stipulation of Facts was used by plaintiff for factual support during the settlement negotiation period. Its exhibit list includes items numbered 1–29. The exhibits include condensed balance sheets and revenue statistical analyses that are artful and designed to reflect plaintiff's segregation theories.

This melange of documentary materials results in a grossly enlarged and unfocused record. One result is to afford counsel the ability to reference factual materials that contain differing shadings and connotations. Another result is a factual mixture available to use in argument as opportunity presents.[64]

Plaintiff's contention that defendant's contact with the Secretary of the City Council to obtain a certification of copies of the City records was improper and prejudicial in the context of this case is specious. The relevance and utility of the various charters in the pages sought to be stricken to the refund claim has been discussed above.

In summary, contrary to plaintiff's assertions, there is no precedent or statutory mandate which defendant disregarded, nor are there facts which defendant asserted falsely or without reasonable grounds. Both counsel failed to comply with pretrial instructions in preparation and admission of trial exhibits en masse. Accordingly, plaintiff's motions to strike are denied. Sanctions under RCFC 11 are not warranted on the basis of the record in this case. Plaintiff's request for all costs of the appeal to the Federal Circuit, including attorney fees, is denied.

## CONCLUSION

For the reasons stated in I above, the RRB February 22, 1989, decision does not apply segregation concepts to the period January 1, 1985, through November 4, 1987. During the period from November 10, 1987, to February 22, 1989, plaintiff wanted to preserve a right to set aside the lease/sale project and intended to maintain until November 4, 1987, the reporting position with the RRB and its tax position under the RRTA and RURT that it had followed since 1940. For that reason, the employment tax-

---

**63.** See fn. 14 *supra*.

**64.** Defendant's trial exhibits contain briefs to the RRB written by plaintiff's counsel as well as transcripts presented to the RRB of testimony taken in other proceedings. This resulted in anomalous situations, such as when defendant in a requested finding quotes a June 7, 1988, letter from plaintiff's counsel to the RRB General Counsel as an admission: "[T]he City of Galveston [was] the legal entity charged by the Interstate Commerce Commission's order of November 28, 1940 with the duty of operating railroad properties." (alterations in original.) Plaintiff objected: "The United States is simply quoting arguments made in a prior administrative matter. This is not a primary fact in this case and is mere argument." Another anomaly is shown in the objection and reply to plaintiff's requested findings concerning the list of employees carried on the rail payroll. Defendant objected: "Mr.

Marchand testified that he does not know why plaintiff had a rail and a regular payroll. He added that he does not know whether employees even knew that there were two payrolls, and which one they were on. He also testified that there were no differences in benefits between employees on what he called the rail and on the regular payrolls." Plaintiff replied: "The rail payroll existed because the Galveston Wharves Railroad was a separate profit/loss center and payroll was an expense. Def.Ex. 16, p. 150–51. The United States misquotes Mr. Marchand's testimony. Mr. Marchand never said that he did not know why there was a rail payroll and a regular payroll and did not say that employees did not know which payroll there were on. Mr. Marchand simply testified that he did not recall whether employees were formally notified about which payroll they were on."

es paid during the relevant years were paid in accordance with applicable statute and regulation and there is no entitlement to any refund.

For the reasons stated in II above, plaintiff has not shown that its port management operations satisfy the standards of 20 C.F.R. § 202.3 for a determination that those operations constitute an identifiable and separate enterprise. Plaintiff has not shown it was entitled to segregation of its port operations and personnel from its operations as a railroad carrier. Plaintiff has not shown that the employment taxes in the relevant period were paid wrongfully to the IRS in contravention of any statute or regulation within the authority of the RRB. Accordingly, plaintiff is not entitled to a refund for the period January 1, 1985, to November 4, 1987.

The Clerk is directed to dismiss the complaint. No costs.